**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Nos. 89-3831 and 90-3855


THOMAS LEE WARD,

Petitioner-Appellant,


versus


JOHN P. WHITLEY, Warden, Louisiana
State Penitentiary, Angola, Louisiana,
ET AL.,

Respondents-Appellees.


Appeals from the United States District Court
for the Eastern District of Louisiana

(May 17, 1994)

Before POLITZ, Chief Judge, KING and GARWOOD, Circuit Judges.

POLITZ, Chief Judge:

Thomas Lee Ward, convicted of first degree murder and sentenced to death, appeals the denial of his petition for a writ of habeas corpus. We affirm.

Background

Upon his release from a California jail Ward boarded a bus for New Orleans. He drank vodka and shot cocaine throughout the three-day trip and slept little, if at all. Arriving late in the evening of June 22, 1983, he went directly to the Hagan Street address of Lydia and John Spencer, where his wife, Linda, and their

children were living. Lydia Spencer was Linda's mother. Explaining that he was on his way to New York and wanted to see his children, Ward was admitted. His wife informed him that she would not accompany him. Ward departed. He testified that he spent the night drinking vodka and beer and injecting cocaine. Around 5:30 a.m., he returned to the Hagan Street house, asking to see his children again. Once again he was admitted. According to his wife, Ward left an address and phone number at which he could be reached in New York and then walked into the Spencers' bedroom. Pulling a gun, he said, "John, I'm sorry I have to shoot you," and fired once at close range, killing John Spencer. He then shot Lydia Spencer five times as she tried to escape. She survived.

A jury convicted Ward of the first degree murder of John Spencer, La. R.S. 14:30. At the penalty phase of the trial, Linda Ward testified that she first had sexual relations with Ward when she was ten years old. She further testified that she saw him have sexual relations with her sister Ramona, aged 14 at the time, and their daughter Tasha, then aged nine. Ernest Scott, Linda's brother, testified to witnessing a sexual encounter between Ward and his sister Lorraine when she was seven. The prosecution introduced a 1975 complaint charging sexual relations with the minor Linda and two of her minor sisters; Ward pleaded guilty to having relations with Linda. The prosecution also offered a 1983 complaint charging Ward with sexual abuse of his daughter Tasha; Ward pleaded guilty to the misdemeanor of cruelty to a minor.

The jury found two statutory aggravating factors and sentenced

2

Ward to death under Article 905.3 of the Louisiana Code of Criminal Procedure. The conviction and sentence were affirmed on appeal and the Supreme Court denied certiorari.[1]

Efforts to obtain post-conviction relief began. The trial court denied Ward's first petition but the Louisiana Supreme Court remanded for an evidentiary hearing, which was conducted over the course of three days. The trial court again denied relief and the Louisiana Supreme Court denied Ward's application for supervisory writs. Ward filed a federal habeas petition under 28 U.S.C. § 2254 which was dismissed for failure to exhaust state remedies on a mental retardation claim. Repairing to state court for another application for post-conviction relief, Ward obtained a second evidentiary hearing at the direction of the Louisiana Supreme Court. Again the trial court denied the petition. In the wake of the Supreme Court's decision in **Penry v. Lynaugh**,[2] the Louisiana Supreme Court denied the application for supervisory writs. Ward then returned to federal court with the instant habeas petition. The district court denied relief; Ward timely appealed and we granted a certificate of probable cause. While his appeal was pending, Ward filed a Fed.R.Civ.P. 60(b) motion seeking the admission of newly discovered evidence. The district court denied that motion but granted a certificate of probable cause. Ward timely appealed that ruling and we consolidated the two appeals for

---

[1]**State v. Ward**, 483 So.2d 578 (La.), cert. denied, 479 U.S. 871 (1986).

[2]492 U.S. 302 (1989).

3

disposition.

Analysis

At the threshold, Ward asks us to remand his case to district court so that he might amend his petition to add a claim that the "reasonable doubt" instruction given to his jury was invalid under **Cage v. Louisiana**.[3]  We stayed disposition of his appeal pending exhaustion of that issue in the Louisiana courts, which denied him relief.  We deny the motion to remand to the district court.  A habeas petitioner may not add new constitutional claims to a petition after the district court has entered judgment.[4]  We express no opinion whatever on the **Cage** issue.

Ward seeks habeas relief on six grounds:  (1) the state withheld **Brady** material; (2) he did not receive effective assistance of counsel; (3) the prosecutor made improper argument; (4) one of the two aggravating circumstances found by the jury has been invalidated; (5) the prosecution eliminated African-American jurors because of their race; and (6) racial discrimination infected the selection of the jury pool and venire.  We address these contentions *seriatim*.

1.    **Brady** material.

Ward contends that his due process rights under **Brady v.**

_____

[3]498 U.S. 39 (1990).

[4]**Kyles v. Whitley**, Nos. 92-3310, 92-3542 (5th Cir. Aug. 7, 1992) (unpublished) (a habeas petitioner may not use Rule 60(b) to raise new constitutional claims after judgment).

4

**Maryland**[5] were violated by the prosecution's failure to produce police documents tending to show that he killed John Spencer and shot Lydia Spencer under the emotional stress of an argument about whether his wife and children would accompany him to New York. These documents, he maintains, contradicted testimony by Lydia Spencer, his wife Linda, and Ernest Scott that no such argument occurred and corroborated his testimony in the penalty phase.

To succeed on a **Brady** claim the petitioner must show, *inter alia*, a reasonable probability that the suppressed material would have changed the outcome of the proceedings.[6] Ward has not done so. The police reports reflect that Ward argued with the Spencers when he returned to the Hagan Street residence on the morning of June 23 and that he believed they were preventing a reconciliation with his wife. That is not sufficient provocation to cause a reasonable person to kill in the heat of passion, as required for a responsive verdict of manslaughter.[7] Nor would the documents have affected the sentencing determination, even if they had convinced the jury to believe Ward's testimony at the penalty phase. Ward testified that he was upset by his wife's refusal to accompany him because that meant the children would stay behind as well. "Something snapped," he stated, when John Spencer said that Linda "was doing all right" in New Orleans. The prospect that the

---

[5] 373 U.S. 83 (1963); see also **Giglio v. United States**, 405 U.S. 150 (1972).

[6] **United States v. Bagley**, 473 U.S. 667 (1985).

[7] La. R.S. 14:31; **State v. Tompkins**, 403 So.2d 644 (La. 1981); **State v. Johnson**, 613 So.2d 746 (La.App. 1993).

5

jury might have found reduced culpability because of John Spencer's support of his step-daughter's decision not to accompany her husband to New York is remote at best. There is no reasonable possibility that the jury would have reached a different result at either phase of the trial had the police documents been produced.

Ward also asserts a **Brady** violation in connection with possibly missing portions of the prosecutor's files sought in connection with post-conviction proceedings. He has not shown that any of these documents contained **Brady** material nor a reasonable probability that they were outcome-determinative. The prosecutor was uncertain what portion of the file, if any, was missing and merely speculated that the file was incomplete because it was relatively thin. This assignment of error is without merit.

2.   <u>Ineffective assistance of counsel</u>.

Ward asserts multiple ways in which his trial counsel allegedly failed to provide adequate representation. To prevail on a claim of ineffective assistance, he must show that (1) counsel's performance was so deficient as to fall below an objective standard of reasonableness and (2) there is a reasonable probability that, but for the unprofessional errors, the result of the proceeding would have been different.[8]  Ward has succeeded on neither prong. Counsel's overall performance[9] was not "outside the wide range of

_____

[8]**Strickland v. Washington**, 466 U.S. 668 (1984); **Sharp v. Puckett**, 930 F.2d 450 (5th Cir. 1991).

[9]**Kimmelman v. Morrison**, 477 U.S. 365 (1986).

6

professionally competent assistance"[10] and his errors, viewed separately and cumulatively, did not render the result of either the guilt or penalty phase unreliable.

At the heart of the ineffectiveness complaint is counsel's failure to present evidence of Ward's good character at the penalty phase. Counsel testified at the state post-conviction hearing that this omission was a matter of trial strategy. During his initial investigation of Ward's background counsel discovered the sexual abuse of the minors. While it was settled law that those instances of sexual misconduct for which Ward had been convicted were admissible at the penalty phase of the trial, defense counsel believed the law unsettled as to whether evidence of unadjudicated incidents was admissible. By bringing in good character evidence defense counsel feared that he would open the door to such evidence. He therefore limited his case at the penalty phase to the presentation of a report of a psychologist who evaluated Ward in California, which could not be cross-examined, and a 1965 order obtained by Ward's previous wife. Ward unexpectedly decided to testify, changing the dynamics of the defense.

Louisiana law was unsettled as to the admissibility of unadjudicated acts of misconduct at the time of Ward's trial in August 1984.[11] Ward argues, however, that once the trial court overruled his objection to the admission of bad acts evidence, his trial attorney could have introduced good character evidence

---

[10]**Strickland**, 466 U.S. at 690.

[11]See **State v. Brooks**, 541 So.2d 801 (La. 1989).

7

without waiving his objection. That argument is misplaced. The issue is not waiver of the objection but rather a removal of the grounds for the original objection. As explained by Professors Wright and Graham:

> It is important to distinguish . . . between action of a party that is asserted to estop him from objecting and action that makes admissible evidence that would otherwise be inadmissible. For example, in a prosecution for sale of heroin, the fact that the defendant's mother-in-law died two years before the date of the sale would be irrelevant. But if the defendant takes the stand and testifies, by way of alibi, that at the time of the crime he was taking tea with his mother-in-law, evidence that she was then mouldering in the grave is admissible to impeach him and to disprove the alibi. . . . What the defendant has done is to introduce evidence that changes irrelevant evidence to relevant evidence.[12]

Trial counsel had objected to evidence of sexual molestation on the grounds of relevance. Had he introduced good character evidence, the objectionable evidence would have become relevant. We cannot say that trial counsel's strategy, although ultimately unsuccessful, was unsound.

Ward also charges that trial counsel did not adequately investigate his case and therefore did not have sufficient information to form a sound strategy. We find no evidence in the habeas record that would have changed trial counsel's strategy had it been garnered, or changed the outcome of the proceedings had it been presented. Dr. Robert Guthrie, the California psychologist, testified that Ward placed great importance on keeping his family

---

[12] 21 C. Wright and K. Graham, Jr., Federal Practice and Procedure: Evidence, § 5039 at 199-200 (1977 and 1994 Supp.); see also **King v. Puckett**, 1 F.3d 280 (5th Cir. 1993).

together, had a good relationship with his children and provided well for them.  His examination of Ward's daughter indicated that Ward had not molested her.  Llewellyn Gedge, an attorney who represented Ward in efforts to regain custody of his children from the state, and Dennis Burden, a friend, submitted affidavits attesting to Ward's devotion as a parent; neither had observed indications of child abuse.  Ward's eldest son's affidavit declared that he would have testified that his father was a good parent.  Ward himself testified about his childhood in Long Island and his work history, denying sexual relations with anyone but his wife.  We cannot conceive, as a matter of law, how such testimony could have outweighed the overwhelming eyewitness testimony of sexual abuse.[13]

Ward complains of trial counsel's failure to obtain the transcript of the trial of the 1975 sexual misconduct charges.  That transcript, Ward maintains, would have shown that Lydia Spencer had suborned perjury, supporting his claim that she maliciously concocted the sexual abuse charges against him.  Trial counsel tried to obtain the transcript but was unable to do so for lack of funds.  Ward did not produce the transcript on collateral review; the record before us contains no showing of prejudice.

Another aspect of Ward's failure-to-investigate complaint is that defense counsel did not interview Lydia Spencer, Linda Ward,

---

[13]Ward also complains of counsel's failure to contact Cecil Travis, a wealthy friend.  Counsel testified that he tried to telephone Travis but the woman who answered the call would not talk to him and his call was not returned.  Travis died before the habeas hearing.

or Ernest Scott prior to trial.  Counsel testified that they had moved and that he was unable to locate them.  This impacted his cross-examination.  With no knowledge of how she would respond, he asked Linda Ward whether she wanted Ward executed.  Her response was in the affirmative.

It obviously is preferred trial preparation that an attorney or someone on his behalf interview witnesses before trial.  We cannot say, however, that defense counsel's unsuccessful efforts to locate these three witnesses fell below prevailing professional norms to the point of constitutional implication.  Utility and telephone company records were reviewed without success.  Funds were limited and counsel's investigators could suggest no further practical measures.

It is a basic rule of cross-examination:  Never ask a question for which you do not know the answer.  Every experienced trial lawyer realizes that that rule is honored more in the breach than the observance.  We do not perceive a reasonable possibility of a different result but for defense counsel's blunder, given the prosecution's evidence.  "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system.  The purpose is simply to ensure that criminal defendants receive a fair trial."[14]

Ward also criticizes his trial counsel for not interviewing employees at Champs, the liquor store where he bought vodka and

---

[14]**Strickland**, 466 U.S. at 689.

10

beer after his first visit to the Hagan Street house; had he done so, Charles Washington, a store clerk, attested that he would have confirmed that Ward had purchased alcohol. Trial counsel decided that a visit to Champs would be futile because Ward told him that he had not seen anyone there that he knew. Further, he had found Champs personnel singularly uncooperative in past efforts to elicit information. Although another attorney might have decided differently, we are not prepared to say that trial counsel's decision not to investigate at Champs was unreasonable under these circumstances.[15]

Ward himself bears the blame for some of the deficiencies in his defense. He criticizes his lawyer's failure to obtain a toxicologist. The toxicologist whom his lawyer consulted, however, withdrew at the eleventh hour, stating that he could not help. Trial was continued for two weeks while counsel scrambled to find another. Counsel finally located a forensic psychiatrist but Ward refused to speak with him. Ward also faults his trial attorney for failing to prepare him to testify. In the critical weeks preceding trial, however, Ward grew increasingly hostile and ultimately refused to speak with trial counsel or the lawyer who joined the defense team shortly before trial. Ward gave no indication of a change in this posture at trial; he sat as far as possible from

---

[15]See **Strickland**, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.").

11

counsel and rejected counsel's advice to testify at the guilt phase. Ward's decision to testify at the penalty phase was his unilateral last-minute choice. Finally, Ward complains that his attorney committed the cardinal sin of not producing the evidence that he promised in his opening statement. That failure was due in large part to Ward's refusal to testify at the guilt phase. Whatever the reason for Ward's refusal to cooperate, he cannot now blame the consequences on his trial attorneys.

Finally, Ward claims ineffectiveness in the conduct of *voir dire*, complaining that counsel did not request individual examination and did not ask "open-ended" questions. Again, while these may be better trial practices, they are not mandated by the sixth amendment; counsel's deviations did not place his performance outside the wide range of professional competence. Ward also complains that his attorney did not rehabilitate "scrupled" jurors. Counsel testified that it is his practice to take a "soft" approach with potential jurors and preserve his objections for appeal. Ward has shown no prejudice from this strategy.

3. <u>Improper prosecutorial argument</u>.

Ward challenges multiple aspects of the prosecution's closing argument. None of the assigned errors warrant issuance of the Great Writ.

Ward maintains that the prosecutor urged the jury to impose the death penalty partly as punishment for prior sexual offenses, thereby subjecting him to double jeopardy. We do not so interpret the challenged comments.

The prosecution closed its argument with the plea "Come back with a proper penalty for this man and for his actions over the last twenty to thirty years."  That statement standing alone is problematic but in rebuttal the prosecution explained further.

> You give him life, he wins.  You give him life and you walk out of here and he wins, and I will tell you why.  Look at his criminal history.  He should not only have been sentenced to life imprisonment, he ought to be doing about twenty life sentences and in the state of Louisiana, not the revolving doors of California and New York.  In the state of Louisiana he would have gone to jail for life imprisonment ten years ago the first time he fooled with one of his children who was under age twelve or one of those children who was under age twelve.  Life imprisonment, he would have gone for here.  If you add up all the times, all the crimes he has committed on those children, he should be doing a thousand years right now for all that, and what has he done?  Nothing, he is out, essentially he is out and he is facing this charge.  You give him life he wins, but what you are giving him is what he deserved ten years ago, fifteen years ago, twenty year ago when he was convicted of rape in New York.  That's not what he deserves now.

That was not an urging to execute Ward as punishment for his prior offenses.  The prosecution was contending that life imprisonment would have been appropriate for Ward's prior violations, but the murder called for a more severe punishment.  We do not lightly attribute an improper meaning to ambiguous prosecutorial comment.[16]  The prosecution did not urge the jury to punish Ward a second time for his prior offenses; it sought what it considered appropriate punishment for the offense at issue.

Next Ward contests the prosecutor's references to John Spencer's good character.  The prosecution may argue the human cost

---

[16]**Boyde v. California**, 494 U.S. 370 (1990), quoting **Donnelly v. De Christoforo**, 416 U.S. 637 (1974).

of the charged offense unless its statements are so inflammatory as to deprive the defendant of a fundamentally fair trial.[17]   The portrayal of John Spencer as a good provider for his step-daughter's children was not improper.

We agree with Ward's contention, however, that the prosecutor's argument that intoxication was not a mitigating factor was improper.  Among the mitigating circumstances which Louisiana juries must consider is impairment of a defendant's capacity "to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law . . . as a result of . . . intoxication." [18]   Despite this legal requirement, the prosecution argued:

> [E]ven if he was high on cocaine and he had been drinking booze, [defense counsel] says that because of that, that's mitigation.  You shouldn't feel as badly towards him because of that; that makes this better.  Think of the message you send to this community if you are going to buy that theory and buy that line of nonsense.  It makes it pretty convenient that if I want to go kill somebody the best thing for me to do is go out and get a pint of booze first, drink it down and then I can come to Court and say I was drunk.  Don't put me in the electric chair because I had a pint of booze before I did it, or I did a line of cocaine before I did it.  That's absolutely absurd.  No one pinned him down and poured booze down his throat, no one pinned him down and stuffed cocaine up his nose, he did it to himself.  Y'all shouldn't feel bad about that, not one bit, not one bit.

There is a fine line between the argument that a statutory mitigating circumstance merits no weight in the jury's ultimate decision and the argument that the mitigating circumstance should

---

[17]**Payne v. Tennessee**, 501 U.S. 808 (1991); **Black v. Collins**, 962 F.2d 394 (5th Cir.), cert. denied, 112 S.Ct. 2983 (1992).

[18]La. Code Crim. P. 905.5(e).

14

not be considered or is not mitigating.  The former is permissible under Louisiana law;[19] the latter is not.[20]  The prosecution crossed the line in making this argument.

An improper prosecutorial argument that does not implicate a specific constitutional provision, however, is not cognizable on collateral review unless the defendant shows an abridgment of due process, that is, that the improper argument rendered the proceeding fundamentally unfair.[21]  Ward has not done so.  The trial court correctly instructed the jury that impairment of mental capacity due to intoxication was a statutory mitigating factor.  The court also gave the jury the standard charge that statements by the lawyers were not to be taken as evidence and that it was bound to apply the law as given by the court.  In light of the court's charge it is reasonable to conclude that the jury viewed the prosecutor's erroneous and excessive comments as no more than the prosecutor's exhortation to accord that circumstance little or no weight.

Finally, Ward complains that the prosecutor violated his privilege against self-incrimination by commenting during the sentencing phase about his failure to testify at the guilt phase. The offending comments were:

---

[19]**Sawyer v. Whitley**, 945 F.2d 812 (5th Cir. 1991), aff'd, 112 S.Ct. 2514 (1992).

[20]Cf. **Boyde**.

[21]**Bagley v. Collins**, 1 F.3d 378 (5th Cir. 1993); **Rogers v. Lynaugh**, 848 F.2d 606 (5th Cir. 1988).

15

You know what ought to be the most offensive thing of all this, you know what ought to infuriate you and I'm sure it does, he's a stinking liar `cause he gets up here on the witness stand [during the sentencing phase] and he lies to you.  He lies, he is not going to be a man and get up here and say, alright, you found me guilty.  I didn't testify at my trial because of that criminal record that I knew would come out under cross examination by the D.A., y'all know that's why he didn't take the stand at the trial, `cause all that would have come out.  He doesn't say you found me guilty, I did it.  Please, don't sentence me to death.  Please have mercy on me.  Does he do that?  No, he gets up there and he is indignant, he is a horrible man, and he is going to get up there and he defies you to sentence him to death.

The prosecution's attempt to use Ward's election of his right not to testify at the guilt phase of his trial to argue bad character at the penalty phase was improper.  That error warrants reversal on collateral review only if it had a substantial and injurious effect or influence on the outcome.[22]  This it decidedly did not have.  The argument that Ward was a bad person deserving of death because he did not inculpate himself before the jury pales beside the other evidence of bad character, to-wit, his attempt to kill Lydia Spencer after killing John Spencer and his sexual encounters with the children in his family.  We perceive no gain for the prosecution in the prosecutor's improper comments in this instance.

4.    Invalid aggravating circumstance.

Louisiana law requires the jury to find at least one aggravating circumstance before it may consider the death penalty.[23]

---

[22]**Brecht v. Abrahamson**, 113 S.Ct. 1710 (1993).

[23]Article 905.3 of the Louisiana Code of Criminal Procedure provides:  "A sentence of death shall not be imposed unless the jury finds beyond a reasonable doubt that at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, recommends that the sentence of death be

16

Ward's jury found two: (1) knowing creation of a risk of death or great bodily harm to more than one person and (2) a significant prior history of criminal activity. Before the disposition of Ward's appeal the Louisiana Supreme Court invalidated the latter as unconstitutionally vague.[24] Nevertheless, it affirmed Ward's sentence, reasoning that one valid aggravating circumstance supported the verdict and that the evidence offered to show criminal history was otherwise admissible as proof of character. Ward claims prejudice on the grounds that a second aggravating factor was improperly on the scales when the jury chose between life and death.

The Louisiana capital punishment statute does not direct the jury to weigh aggravating against mitigating circumstances. After the threshold finding of at least one aggravating factor, the statute does not structure the jury's deliberations other than to require that it <u>consider</u> all mitigating circumstances. Addressing a substantially similar death penalty statute in **Zant v. Stephens**,[25] the Supreme Court expressly rejected the argument now urged by Ward and held that the erroneous classification of otherwise admissible evidence as an aggravating circumstance does not invalidate a death sentence where the jury also finds a valid aggravating circumstance. That is substantially the same analysis applied by

---

imposed."

[24]**State v. David**, 468 So.2d 1126 (La. 1984), <u>supplemented</u>, 468 So.2d 1133 (1985), <u>cert</u>. <u>denied</u>, 476 U.S. 1130 (1986).

[25]462 U.S. 862 (1983).

the Louisiana Supreme Court to Ward's claim on direct appeal and approved by this court on collateral review of Louisiana death penalty sentences.[26]

**Stephens**, however, reserved the question of the impact of an invalid aggravating circumstance in a statutory scheme in which the factfinder must weigh aggravating against mitigating circumstances. According to Ward, that is the question presented here because the prosecutor urged the jury to engage in weighing. Ward misframes the issue.

The prosecutor misstated the law when he exhorted the jury to weigh aggravating against mitigating circumstances. The trial court, however, correctly instructed the jury:

> You are required to consider the existence of aggravating and mitigating circumstances in deciding which sentence should be imposed. . . . Before you decide that a sentence of death should be imposed, you must unanimously find beyond a reasonable doubt that at least one aggravating circumstance exists. If you find beyond a reasonable doubt that any of the statutory aggravating circumstances existed you are authorized to consider imposing a sentence of death. . . . Even if you find the existence of an aggravating circumstance, you must also consider any mitigating circumstances before you decide a sentence of death should be imposed.

The arguments of counsel perforce do not have the same force as an instruction from the court.[27] Here, where the prosecutor's reference to weighing was cursory, there is no reasonable likelihood that the jury disregarded or misconstrued the court's

---

[26]See, e.g., **James v. Butler**, 827 F.2d 1006 (5th Cir. 1987), cert. denied, 486 U.S. 1046 (1988).

[27]**Boyde.**

18

specific instructions.[28]

    5.    **Batson** <u>claim</u>.

Ward contends that the state exercised seven of its ten peremptory challenges against African-American venirepersons because of their race, in violation of the equal protection clause. He did not object at trial. We repeatedly have held that as a matter of federal law, a contemporaneous objection is a necessary element of a **Batson**[29] claim.[30] Ward argues that the Supreme Court impliedly rejected that position in **Ford v. Georgia**.[31] We disagree.

**Ford** was tried before the Supreme Court decided **Batson**. In accordance with the prevailing evidentiary burden of **Swain v. Alabama**,[32] the defendant filed a pretrial motion claiming that the prosecution routinely exercised its peremptory challenges to strike African-Americans in cases with black defendants and asked that it be prohibited from doing so in the case at bar. The district court denied the motion. The case proceeded to trial; the prosecution exercised nine of its ten peremptories to strike African-American jurors. On the second day of trial the court called a conference

---

[28]Ward did not object to the prosecutor's statement at trial. Nor did he allege a misstatement of the law on direct or collateral review. Accordingly, we do not address it.

[29]**Batson v. Kentucky**, 476 U.S. 79 (1986).

[30]**Wilkerson v. Collins**, 950 F.2d 1054 (5th Cir. 1992), <u>cert</u>. <u>denied</u>, 113 S.Ct. 3035 (1993); **Jones v. Butler**, 864 F.2d 348 (5th Cir. 1988) (on petition for rehearing), <u>cert</u>. <u>denied</u>, 490 U.S. 1075 (1989).

[31]498 U.S. 411 (1991).

[32]380 U.S. 202 (1965).

19

in chambers to put that fact on the record.  The prosecutor asked the court whether he needed to explain the justifications for his challenges and the judge said he did not.  After he was convicted and sentenced to death Ford moved for a new trial, claiming the racial exercise of peremptory challenges.  The motion was denied. On appeal the Supreme Court of Georgia refused to reach Ford's claim on the grounds of procedural bar.  The court interpreted a case decided after Ford's trial to establish a rule that an equal protection challenge must be lodged after the jurors are selected and before they are sworn.  Because that was not done in Ford's case, the court rejected his **Batson** argument.

The Supreme Court reversed.  It found that Ford had raised a **Batson** claim prior to trial and held that a state may not retroactively bar litigation of a federal constitutional right. Ward contends that the applicability of the state procedural bar would have been moot if there was a federal requirement of a contemporaneous objection.  To the contrary, the Court's inquiry whether the state properly found Ford's objection untimely was premised on the fact that he had complained of the racial use of peremptories in time for the trial court to require an explanation from the prosecution.  As the Court in **Ford** recognized, **Batson** required a "timely objection" but left the definition of "timely" to the trial courts.  The opinion in **Ford** addresses the latter issue only.  In the matter *sub judice*, Ward raised no **Batson** objection in the trial court.  He has not satisfied the requisites for a **Batson** claim.

6.    <u>Racial discrimination in the selection of the jury pool and venire</u>.

Ward contends that the Orleans Parish jury commissioners excluded blacks from his jury pool and venire, in violation of his sixth and fourteenth amendment rights.  The district court rejected this claim.  Ward maintains that he was entitled at least to discovery and an evidentiary hearing.  We are not persuaded.[33]

A federal habeas court must allow discovery and an evidentiary hearing only where a factual dispute, if resolved in the petitioner's favor, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing.[34] Conclusionary allegations are not enough to warrant discovery under Rule 6 of the Federal Rules Governing Section 2254 Petitions; the petitioner must set forth specific allegations of fact.[35]  Rule 6, which permits the district court to order discovery on good cause shown, does not authorize fishing expeditions.[36]

The short answer to Ward's assignment of error is that he had the opportunity to present evidence at his state post-conviction hearing.  We do not dispose of Ward's argument on these grounds,

---

[33]While his appeal was pending Ward moved the district court for admission of newly discovered evidence pertinent to this claim. The district court denied the motion.  In the interesets of justice we consider the evidence.

[34]**Harris v. Nelson**, 394 U.S. 286 (1969); **Young v. Herring**, 938 F.2d 543 (5th Cir. 1991) (on remand), <u>cert</u>. <u>denied</u>, 112 S.Ct. 1485 (1992); **Mayberry v. Petsock**, 821 F.2d 179 (3d Cir.), <u>cert</u>. <u>denied</u>, 484 U.S. 946 (1987).

[35]**Willie v. Maggio**, 737 F.2d 1372 (5th Cir.), <u>cert</u>. <u>denied</u>, 469 U.S. 1002 (1984); **Mayberry**.

[36]**Kirkpatrick v. Whitley**, 992 F.2d 491 (5th Cir. 1993).

however, because the state trial court denied discovery and he later obtained additional evidence.

Factual development will not help Ward's sixth amendment claim. He informs that his venire was half black and half white and does not dispute the prosecution's contention that the eligible population had essentially the same racial composition. Accordingly, Ward cannot prove underrepresentation, a necessary element of a fair cross-section claim.[37]

Ward's fourteenth amendment claim fares no better. He alleges that the jury commissioners knew the race of each member of the venire before directing the members to criminal or civil district court and that blacks were underrepresented in criminal court venires.[38] That does not constitute a specific factual allegation of intentional discrimination. Ward attempts to bolster his petition with a hearsay affidavit in which one of his attorneys attests that the former director of the jury commission told him that he had heard that the district attorney wanted more whites on criminal court juries. Unlike **Amadeo v. Zant**,[39] on which Ward relies, there is no indication that the commission heeded the district attorney's purported preferences. In another affidavit, Ward's paralegal attests that a jury commissioner told her that she

---

[37]**Duren v. Missouri**, 439 U.S. 357 (1979).

[38]Because African-Americans were present on Ward's venire in proportion to their representation in the population, we can only presume that alleged underrepresentation in the instant context refers to the appearance of proportionately fewer black persons on criminal court venires generally than on civil court venires.

[39]486 U.S. 214 (1988).

selected more whites than blacks from the jury wheel to compensate for differing appearance rates.[40]  That is the only specific factual allegation of intentional discrimination presented by Ward but it cuts against his charge that blacks were steered onto civil and away from criminal venires.

As our colleagues on the First Circuit have succinctly stated, "Habeas corpus is not a general form of relief for those who seek to explore their case in search of its existence."[41]  Ward's discrimination claim falls within that proscription.

The judgment of the district court is AFFIRMED.

---

[40]In a counter-affidavit, the commissioner denies the statement.  In addition, her tenure in office ended before the selection of Ward's venire.

[41]**Aubet v. Maine**, 431 F.2d 688, 689 (1st Cir. 1970).