**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-41264

JOHN BALTAZAR,

Petitioner-Appellant,

VERSUS

JANIE COCKRELL, Director of the
Texas Department of Criminal Justice,

Respondent-Appellee.

Appeal from the United States District Court
For the Southern District of Texas, Corpus Christi Division

(2:00-CV-289)

March 18, 2002

Before DeMOSS, PARKER, and DENNIS, Circuit Judges.

PER CURIAM:[*]

A Texas state court sentenced John Richard Baltazar to death for the capital murder of a five-year-old girl. Baltazar now seeks a Certificate of Appealability (COA) to pursue habeas corpus relief in this court. In his application for a COA, Baltazar argues (1)

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

that the district court erred in denying him an evidentiary hearing on his attorneys' ineffective assistance, and (2) that the state's use of the transferred intent doctrine violated his due process rights because it negated the state's burden of proving that he intended to kill a person under six years of age. Because Baltazar has failed to make a substantial showing that his constitutional rights were violated, we deny his application for a COA.

## I. Facts and Procedural History

In 1997, John Baltazar's mother, Jesusista Hernandez, was dating Ted Cuellar. On one occasion, Baltazar and his brother told Cuellar that if he ever ended his relationship with their mother, they would kill him and his family. On September 27, 1999, Cuellar and Hernandez engaged in a violent, relationship-ending argument during which Cuellar assaulted Hernandez.

That evening, Baltazar and several of his friends drove to the home of Cuellar's sister, Matilde Marines, where Cuellar was known to stay. When they arrived at the Marines home, Baltazar and his friend, Johnny Gonzales, walked to the front door; Baltazar was armed with a .22 caliber pistol. Hoping to find Cuellar sleeping on the couch, Baltazar kicked the door open and began shooting into the living room. Cuellar, however, was neither on the couch nor anywhere else in the Marines home. Instead, the living room was occupied by the Marineses' five-year-old daughter, Adriana, and her

ten-year-old cousin, Vanessa, who were both lying on the couch watching television. Two of Baltazar's bullets hit Adriana in the head and one hit Vanessa in the chest. Vanessa identified Baltazar as the shooter.

Baltazar then moved down the hallway toward Matilde and Jose Marines's bedroom. The couple had heard a loud bang and were getting out of bed when Matilde opened the door to find Baltazar and Gonzales standing in her doorway. Baltazar was shirtless and had a gun in his outstretched hand. As Jose got out of bed, Baltazar shot him twice, once in the mouth and once in the neck. Dalinda Cuellar, Matilde's sister, was in her bedroom across the hall and witnessed Baltazar shoot Jose. Matilde closed and locked her bedroom door after the shots and Baltazar and Gonzales fled the scene.

At 10:20 p.m., Matilde called "911," and police and medical workers arrived soon thereafter. Although Jose and Vanessa survived their gunshot wounds, Adriana died shortly after arriving at the hospital.

Johnny Gonzales's nephew and girlfriend were waiting in a car outside the Marines home during the shootings. They both testified that they heard six gunshots come from inside the Marines home. They also testified that later that evening, Baltazar confessed to shooting someone in the face in retaliation for his mother's assault.

While the police were still questioning family members at the

crime scene, Ted Cuellar arrived at the scene and attempted to enter the home. Police officers stopped him at the door and explained what had happened. Cuellar told the police that he had broken up with Baltazar's mother earlier that night and informed them of his reasons to suspect that Baltazar and his brother were involved in the shootings. Based on this information, the police began searching for Baltazar. Early the next morning, officers found him at the trailer of his girlfriend, Linda Clark. Baltazar tried to flee when he spotted the officers, but after a struggle, he was arrested for evading detention. Before he was released on his evading detention charge, a homicide detective confiscated his tennis shoes. The shoes were later found to match the sneaker print on the Marineses' door.

Baltazar's parole officer testified that during the shootings, Baltazar was under a home-restriction curfew every evening from 9:00 p.m until 7:00 a.m. Baltazar wore a monitoring device that automatically alerts law enforcement authorities when he is out during his curfew. On the night of the shootings, Baltazar's monitoring device indicated that he was out of his house from 9:20 p.m. to 10:54 p.m. and from 1:16 a.m. until 8:28 a.m. the following day. The first absence would have provided Baltazar with adequate time to commit the shootings. During the second absence, Baltazar had gone to Clark's trailer, where he was later arrested.

Baltazar was convicted of capital murder and aggravated assault on March 9, 1998. On March 11, 1998, following a separate

punishment hearing, the jury answered two special issues supporting a death sentence.  While his direct appeal was pending, the Texas Court of Criminal Appeals appointed an attorney to represent Baltazar in his state habeas proceedings; on March 31, 1999, that attorney filed a writ of habeas corpus in state court.  The Court of Criminal Appeals affirmed the conviction and denied Baltazar's state habeas petition.

Through the same attorney who represented him in his state habeas proceedings, Baltazar filed a petition for writ of habeas corpus and a request for an evidentiary hearing in federal district court.  On September 27, 2001, the district court granted summary judgment to the state and denied Baltazar's petition without holding an evidentiary hearing.  The district court also denied Baltazar a COA sua sponte.  Baltazar has now applied for a COA with this court.


## II.  Analysis

A habeas petitioner cannot appeal the denial of habeas relief from the district court unless he obtains a COA.  28 U.S.C. § 2253(c)(1).  Since Baltazar filed his habeas application after April 24, 1996, the rules for COA review are governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).  Lindh v. Murphy, 521 U.S. 320, 336 (1997).  "Under AEDPA, a COA may not issue unless 'the applicant has made a substantial showing of the

denial of a constitutional right.'" Slack v. McDaniel, 529 U.S. 473, 483 (2000) (citing 28 U.S.C. § 2253(c)(2)). "When a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," or, at least, that the "issues presented were adequate to deserve encouragement to proceed further." Id. at 484; Moore v. Johnson, 225 F.3d 495, 500 (5th Cir. 2000). Although the nature of the penalty in a capital case is an appropriate consideration in evaluating a COA application, "the severity of the penalty does not, in and of itself, require the issuance of a COA. . . . In capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner." Clark v. Johnson, 202 F.3d 760, 763 (5th Cir. 2000); Lamb v. Johnson, 179 F.3d 352, 356 (5th Cir. 1999).

To obtain habeas relief, a petitioner must either demonstrate that the state court's decision "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court's decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if

the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id. A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. A state court's determination of factual issues are presumed correct and the applicant bears the burden of rebutting the presumption with clear and convincing evidence.

## A. Evidentiary Hearing/Ineffective Assistance Claims

Baltazar contends that the district court erred in denying him an evidentiary hearing on his Sixth Amendment ineffective assistance of counsel claims. Baltazar bases his ineffective assistance claims on two criticisms of his trial counsels' representation. He first argues that his attorneys overlooked potential Fourth Amendment challenges to his arrest and the seizure of his tennis shoes ("Fourth Amendment claims"). He also claims that his attorneys were remiss in failing to present mitigating evidence during the punishment phase of his trial ("mitigating evidence claims"). We reject both of these arguments because Baltazar has failed to develop a factual or legal basis for these allegations.

To prevail on his ineffective assistance claims, Baltazar must

show that (1) his trial counsels' performance was so deficient that it fell below an objective standard of reasonableness and (2) there is a reasonable probability that, but for his attorneys' errors, the result of his trial would have been different. Strickland v. Washington, 466 U.S. 668, 687 (1984); Haynes v. Cain, 272 F.3d 757, 761 (5th Cir. 2001). The objective standard of reasonableness is "highly deferential" and includes a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. In deciding ineffective assistance claims, a court need not address both prongs of the Strickland standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. Amos v. Scott, 61 F.3d 333, 348 (5th Cir. 1995).

A habeas petitioner's right to an evidentiary hearing is governed by 28 U.S.C. § 2254(e)(2) and Rule 8 of the Rules Governing § 2254 Cases. If a petitioner "failed to develop the factual basis" in his state habeas proceedings for his ineffective assistance claims, the federal habeas court shall not conduct an evidentiary hearing on those claims unless certain statutory conditions are satisfied. 28 U.S.C. § 2254(e)(2). The Supreme Court has held that the phrase "failed to develop," as used in § 2254(e)(2), implies that the failure to develop facts was the result of "a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams, 529 U.S. at 434. If the petitioner was not diligent in developing his claims

in state court, § 2254 prohibits a federal court from providing an evidentiary hearing unless:

> (A) the claim relies on –
>     (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>     (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). If the petitioner's failure to develop facts in state court was not due to his lack of diligence, he is excused from showing compliance with the § 2254 requirements, Williams, 529 U.S. at 437, and the decision to provide an evidentiary hearing is within the district court's discretion. Rule Governing § 2254 Cases 8(a); Clark, 227 F.3d at 284.

The state habeas court rejected Baltazar's Fourth Amendment claims because he submitted no admissible evidence of ineffective assistance by his trial attorneys. During his state habeas proceedings, the director provided a joint affidavit from both of Baltazar's trial attorneys stating that they prepared a motion to suppress this evidence but that Baltazar instructed them not to file it. The affidavit states that Baltazar told them not to file the motion because he feared that this strategy could increase the

chances that his wife,[1] who drove him to and from the murder scene, might be implicated in the crime.  As we noted in United States v. Mascat, 896 F.2d 88, 92 (5th Cir. 1990), "we must give great deference to choices which are made under the explicit direction of the client."  Although he had the opportunity to respond, Baltazar submitted no admissible evidence to contravene this affidavit.  The only factual basis for his claim was his habeas counsel's sworn hearsay statement that Baltazar's trial attorneys overlooked the opportunity to file a motion to suppress.  According to Baltazar's habeas attorney, trial attorney Grant Jones admitted during a telephone interview that he "did not see" the issue.

Baltazar asserts that his habeas counsel's sworn hearsay statement "joins issue" on his ineffective assistance claim and entitles him to an evidentiary hearing.  But Baltazar himself concedes that there is no authority for this proposition.  In cases where a habeas petitioner has submitted hearsay affidavits in support of his petition, we have held that those statements do not provide a factual basis for an evidentiary hearing.  Goodwin v. Johnson, 132 F.3d 162, 186 (5th Cir. 1997); Ward v. Whitley, 21 F.3d 1355, 1367 (5th Cir. 1994).  We see no reason why the hearsay

---

[1]  The trial attorneys appear to be referring to Linda Clark, the same person whom we earlier identified as Baltazar's girlfriend. The majority of the references to Clark in the record state that she was Baltazar's girlfriend, not his wife.  Although it is possible that the couple married after he was convicted and sentenced to death, it is more likely that the attorneys' affidavit mistakenly referred to Clark as Baltazar's wife, when she was actually his girlfriend.

statements of one's attorney should be treated differently. Thus, the district court did not abuse its discretion in denying an evidentiary hearing on these claims.

For similar reasons, we conclude that the district court acted within its discretion when it denied Baltazar an evidentiary hearing on his mitigating evidence claims. Baltazar argues that his attorneys should have hired a mental health expert to evaluate him. According to a doctor who evaluated him after trial, Baltazar suffers from two behavioral disorders, was subjected to violence as a child, and is alcohol dependant. But in the state habeas proceedings, one of Baltazar's trial attorneys explained that he chose not to have Baltazar examined by a mental health expert because he believed that, given Baltazar's extensive criminal history, the State might have used this evidence to bolster its argument that Baltazar posed a continuing threat to society. The trial attorneys formed this strategy after reviewing reports from Baltazar's previous psychological examinations.

The failure to present a mental health witness at trial does not qualify as ineffective assistance if the attorney articulates a valid strategical reason for not presenting the witness. Cannon v. Johnson, 134 F.3d 683, 687-88 (5th Cir. 1998). Baltazar offered no admissible evidence to contravene the veracity of this proffered strategy; instead, he challenged his attorney's explanation only with hearsay. Baltazar's habeas counsel claims that when questioned about the lack of mitigating psychological evidence in

the record, trial attorney Jones responded that he "did not trust" mental health experts and never used them. As we stated above, a district court does not abuse its discretion in denying an evidentiary hearing when the habeas petitioner's claims are supported only by hearsay.

## B.   Due Process Claims

The state used Texas's transferred intent doctrine[2] to convict Baltazar of the capital murder of a child under six years of age. While there is compelling evidence that Baltazar intended to kill Ted Cuellar, it is decidedly less clear that he intended to kill his actual victim, Adrianna Marines. Baltazar argues that the state's use of the transferred intent doctrine violated his due process rights because it improperly alleviated the state's burden of proving that he had the specific intent to kill a young child.[3]

_____

[2] Texas's "transferred intent" statute appears in § 6.04 of the Texas Penal Code and reads as follows:

(a) A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient.
(b) A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that:
(1) a different offense was committed; or
(2) a different person or property was injured, harmed, or otherwise affected.

[3]   The Texas Capital Murder statute states that "[a] person commits an offense if he commits murder as defined under Section 19.02(b)(1) and . . . the person murders an individual under six

Baltazar's jury charge required the jury to find that Baltazar acted only with the intent to kill Ted Cuellar; it did not require them to find that he specifically intended to kill Adrianna Marines.

Baltazar's claim is without merit under both Texas and federal law. First, on a petition for writ of habeas corpus, we defer to the state courts' interpretation of state law. <u>Fierro v. Lynaugh</u>, 879 F.2d 1276, 1278 (5th Cir. 1989). Texas courts have held that the Texas capital murder statute does not require that a defendant know that his victim is under six years of age. <u>Black v. State</u>, 26 S.W.3d 895, 897 (Tex. Crim. App. 2000) ("We hold that there is no requirement in section 19.03(a)(8) that an offender know or intend that his victim be a child under six."). Second, United States Supreme Court "has never articulated a general constitutional doctrine of mens rea," and it has never held that a state's definition of a crime must include a mens rea element. <u>Powell v. Texas</u>, 392 U.S. 514, 535 (1968); <u>see also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 56 (1996) ("The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been the province of

---

years of age." Tex. Pen. Code Ann. § 19.03(8) (Vernon 1994).

states."). We therefore see no constitutional infirmity in Texas applying the doctrine of transferred intent to this case.

To support his argument that the Constitution requires that the defendant know his victim's age, Baltazar cites United States v. X-Citement Video, Inc., 513 U.S. 64 (1994). In X-Citement Video, the Supreme Court analyzed the scienter requirements of the Protection of Children Against Sexual Exploitation Act, 18 U.S.C. § 2252, which criminalizes the possession and distribution of child pornography. Under an ordinary grammatical reading of the statute, there would be no requirement that the offender know that the pornography in question actually involves minors. Id. at 68. The Court, however, rejected the grammatical reading and held that the better interpretation of the statute presumes a scienter requirement for the age of the performers. Id. at 78.

X-Citement Video is distinguishable from this case in obvious ways. First, the Court's conclusion is based solely on its interpretation of 18 U.S.C. § 2254; the Court did not hold that the Constitution requires a scienter element in age-sensitive crimes. Given that this case involves a state statute, not a federal one, we defer to the Texas courts' interpretation of that statute. Second, the reasoning of the opinion is specific to child pornography. The Court observed that when dealing with obscenity laws, the age of the person in the pornographic image can mean the difference between criminal and innocent behavior. Id. at 72. As such, the Court found it equitable to presume that the statute

required the offender to know that he was dealing with child pornography. To the contrary, the age of Baltazar's murder victim affects only the severity of his punishment. The Supreme Court has upheld such penalty-enhancing laws under similar circumstances. In United States v. Feola, 420 U.S. 671 (1975), the court upheld a federal statute that enhanced the penalty for assaulting a law enforcement officer without requiring that the offender realize that his victim was an officer. The court reasoned that "[c]riminal intent serves to separate those who understand the wrongful nature of their act from those who do not, but it does not require knowledge of the precise consequences that may flow from that act once aware that the act is wrongful." Id. at 685.

Finally, even assuming that the transferred intent instruction was unconstitutional, it does not warrant habeas relief because the instruction allowed the jury to convict Baltazar of capital murder on the alternative ground of killing a person in the course of a burglary.[4] See Tex. Pen. Code § 19.03(a)(2). The Supreme Court has held that a jury need not specify which ground it used to support its conviction when a criminal statute provides alternative grounds for the conviction. Schad v. Arizona, 501 U.S. 624, 630-46

---

[4] In Texas, a person commits burglary "if, without the effective consent of the owner, the person . . . enters a habitation . . . not then open to the public, with intent to commit a felony, theft, or an assault." Tex. Pen. Code Ann. § 30.02(a) (Vernon 1994). There is convincing evidence in this case that Baltazar entered the Marines home without the Marineses' consent and with, at minimum, the intent to assault Ted Cuellar.

(1991).  Since Baltazar has not challenged the sufficiency of the evidence to convict him of felony murder, any error associated with the transferred intent doctrine was harmless.  <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435-36 (1995) (applying harmless-error review to an instruction that "violated the Federal Constitution by misleading the jury").  Baltazar therefore is not entitled to a COA on this ground.

### III.  Conclusion

Baltazar has failed to develop a sufficient factual basis for his ineffective assistance claims; the district court therefore did not abuse its discretion in denying him an evidentiary hearing.  He has also failed to assert a legal basis for his claim that the application of Texas's transferred intent doctrine violated his due process rights.  For the foregoing reasons, Baltazar's request for a COA is DENIED.