727 So.2d 417 (1998)
STATE of Louisiana
v.
Jeffrey L. FROST.
No. 97-KA-1771.
Supreme Court of Louisiana.
December 1, 1998.
Rehearing Denied January 29, 1999.
*421 James Edgar Boren, J. Rodney Baum, Baton Rouge, for Applicant.
Richard P. Ieyoub, Atty. Gen., Douglas P. Moreau, Dist. Atty., John W. Sinquefield, Monisa L. Thompson, Baton Rouge, for Respondent.
CALOGERO, C.J.[*]
On February 3, 1996, an East Baton Rouge Parish grand jury indicted the defendant, Jeffrey L. Frost, for the first degree murder of Regina Slonim in violation of LSA-RS 14:30. After a trial by jury, the defendant was found guilty as charged. After a sentencing hearing, the same jury charged with determining the defendant's guilt unanimously returned a verdict of death. The jury found two aggravating circumstances: (1) the murder was committed during the commission of an armed robbery; and (2) it was committed in an especially heinous, atrocious, or cruel manner.
This matter comes before us on direct appeal under Article V, Section 5(D) of the Louisiana State Constitution. Defendant raises 112 assignments of error. None of the errors is meritorious. Therefore, we affirm the defendant's conviction and sentence.

FACTS
In the early morning of June 21, 1995, the defendant, Jeffrey L. Frost, killed the victim, Regina Slonim, by stabbing her 29 times. Ms. Slonim worked as a night auditor and desk clerk at the East Baton Rouge Howard Johnson's, where the defendant rented a room at a reduced rate and was employed as a part-time maintenance worker. During the course of his employment, the defendant had become familiar with the hotel's system of storing reserve cash funds in safe deposit boxes located behind the front desk. Approximately two weeks prior to the crime, the defendant decided to rob the hotel by removing money from these safety deposit boxes. He specifically selected Ms. Slonim as the victim because she was the night clerk that he liked the least.
It is the defendant's contention that, on the morning of the murder, he lured the victim away from the front desk and into an adjacent hallway, where she would not be seen by passers-by, under the guise of effectuating a previously arranged meeting to sell the victim marijuana. Carrying a knapsack with a change of clothes, wearing latex rubber gloves, and armed with a steak knife he had previously purloined from the hotel kitchen, the defendant approached the victim and asked her to follow him into the hallway. He asked her if she was "ready." When she answered that she was, the defendant immediately stabbed her with the steak knife in the throat, severing her larynx and rendering her unable to scream. A violent struggle ensued in which the defendant proceeded to repeatedly stab the victim about the face, head, and chest, until she died of massive blood loss.
*422 The defendant then obtained the keys to the safe deposit boxes, which he knew to be kept behind the front desk, and took approximately 800 dollars. Before leaving the crime scene, and in an effort to ensure that Ms. Slonim was indeed dead, the defendant "stomped" on her head several times, leaving a bloody imprint of his tennis shoe on her face. The defendant also left bloody footprints on the carpet. He then took the money and traveled to Houston, Texas where he attempted to purchase marijuana with the intention of selling it for a profit back in Baton Rouge.[1]
Two days after the murder, while staying with friends in Houston, the defendant called the Howard Johnson's hotel and explained that he heard about the murder on the news. During this phone call, he expressed particular interest in the police investigation. This phone call, in conjunction with his sudden absence from the hotel, arose suspicion. Based on this information, police obtained a search warrant for defendant's hotel room at Howard Johnson's, wherein they found a Nike Air Max shoe box, marijuana, and bloodied bandages in the bathroom. Police went to the store named on the shoe box and purchased the same type and size of shoe indicated on the box. Subsequent analysis revealed that the tread on the shoes purchased by the police matched the bloody footprints left by the defendant in the hotel.
Police later obtained an arrest warrant which was executed at the home of the defendant's friends with whom he was staying in Houston. After entering the home, police found the defendant apparently hiding on the floor next to a bed. He was handcuffed and arrested. During the arrest, the defendant asked the police to give his friends some money from his pocket. Police responded by removing 197 dollars from the defendant's pocket, explaining that the money would be kept as evidence.[2] Defendant subsequently confessed to his involvement in the murder.
At trial, the jury found the defendant guilty of first degree murder and returned a death verdict. Defendant now appeals his conviction and sentence, raising 112 assignments of error.[3]

Errors Alleged During Voir Dire

Cause Challenges
In assignments of error 48 and 12, defendant argues for reversal of his conviction and sentence claiming the trial court erred in granting the State's challenges for cause as to two venirepersons based on their attitudes regarding the death penalty.[4] Specifically, the defendant alleges that the trial court erroneously applied Louisiana Code of Criminal Procedure article 798(2) when it excused *423 prospective jurors Derek Ward and Valerie White when their attitudes on the death penalty did not prevent them from sitting fairly on the case.
In defining the standard for the exclusion of potential jurors from a capital case based on their views on capital punishment, the United States Supreme Court in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) held that the determination to be made is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Notably, the Witt court stated that "unmistakable clarity" is not required when determining whether this standard has in fact been met. Id. at 424, 105 S.Ct. at 852. The Supreme Court has also held, however, that a capital defendant's Sixth and Fourteenth Amendment rights to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Those veniremen who "firmly believe that [the death penalty] is unjust may nevertheless serve ... so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 1766, 90 L.Ed.2d 137 (1986). Nevertheless, even where a prospective juror has declared his ability to remain impartial, a challenge for cause will be upheld if his responses as a whole "reveal facts from which bias, prejudice, or inability to render judgment according to the law may be reasonably implied." State v. Gradley, 97-0641 p. 6 (La.5/19/98), ___ So.2d ___.
It is reversible error for a trial court to improperly excuse such a venireman despite the fact that the State could have used a peremptory challenge to strike the juror. Gray v. Mississippi, 481 U.S. 648, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). This Court has held that the trial court has great discretion in determining a potential juror's fitness for service and that a trial judge's determination in this regard is owed much deference where it is fairly supported by the record. Gradley, supra, 97-0641 at 6. Such a determination will not be disturbed by this Court on review unless a review of the voir dire as a whole indicates an abuse of discretion. Id. at 7; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227 (1996).

Derek Ward
In assignment of error number 48, the defendant argues that venireman Derek Ward was improperly excused for cause. Ward was excused because his testimony indicated that his attitude towards the mitigating circumstance of "no significant prior criminal history" would have prevented him from rendering an impartial verdict. See La.Code Crim. Proc. Ann. art. 905.5(a) (West 1997). Defendant asserts however, that Ward merely expressed a willingness to consider this mitigating circumstance in light of all other relevant factors in the case and that he could render an impartial verdict. The relevant testimony is the following:
Q: If you didn't know that [Timothy McVeigh, the Oklahoma " 5bomber] had a prior criminal history, you couldn't give him the death penalty for blowing up those people? Is that what you told the judge?
A: Right.
Q: ... But I guess it concerns me suppose you find out thatyou were on the jury and found out that Timothy McVeigh had no criminal record whatsoever, a clean record. You couldn't give him the death penalty?
A: No.
Q: Even though he killed two hundred people, your answer is still no?
A: No.
When questioned by the trial court on this issue, Ward stated the following:
A: Well, the death penalty ... just because someone ... has been locked up or have stolen, that doesn't mean, you knowand then they murderthat doesn't mean they should get the death penalty, but if someone in they *424 full right mind, you know doesn't have any kind ofhow can I put itany kind of
Q: Mental?
A: Yeah, mental problems that have threatened to kill someone and tried it's ... about killing people or they have done killed people, be locked up and got out ... peoples like that, you know, ... I'd ... consider them put, you know, the gas chamber....
Potential jurors in Louisiana are required by law to possess a willingness to consider certain enumerated mitigating circumstances. See La.Code Crim. Proc. Ann. art. 905.5 (West 1997). However, when a potential juror indicates during voir dire that he may afford too much weight to any one particular mitigating circumstance, such that his ability to return the death penalty would be substantially impaired, then that juror is properly excluded for cause. State v. Williams, 96-1023 (1/21/98), 708 So.2d 703, cert. denied, ___ U.S. ___, 119 S.Ct. 99, 142 L.Ed.2d 79 (1998) (two jurors properly dismissed for cause where age of the defendant would have impaired their ability to return the death penalty). From the above trial excerpts, we conclude that Ward's testimony indicated that his attitude regarding the mitigating circumstance "no significant prior criminal history" would have been the overriding factor in his determination of the appropriateness of the death penalty without regard to any other factor including the strength of the aggravating circumstances. Thus, Ward was not dismissed, as the defendant argues, simply because of an expressed willingness to consider, among other relevant considerations, a particular mitigating circumstance. To the contrary, Ward's testimony indicates that "no significant prior criminal history" would have been the overriding consideration for him in determining the appropriateness of the death penalty.
In granting the prosecution's challenge for cause, the trial judge noted that "it was clear in [her] mind that for [Ward] unless a person has a demonstrated history of prior criminal activity involving other murders or attempts at murders or threats to murder, he could not fairly consider the death penalty as an option." A review of Ward's voir dire testimony leads us to the conclusion that the trial judge's ruling is supported by the record. We are not disposed to find that the trial court erred in determining that Ward was unable to accept the law as given him and that he could not be impartial regarding the potential for either penalty option. Thus, the trial judge did not err in granting the State's cause challenge. The assignment of error has no merit.

Valerie White
In unargued assignment of error 12, the defendant alleges that potential juror Valerie White was also improperly excused for cause.[5] White stated on her jury questionnaire that she was against the death penalty. During questioning by the trial court, White stated that she was against the death penalty because her religion forbade her to judge another. When further questioned by the court, she stated:
Q: ... In general, tell me what are your feelings about the death penalty.
A: Me myself, I'm against the death penalty only because I'm notmy religionI'm notI can't judge a person.
* * * * * *
Q: Do you feel that there is any circumstances in which you could put aside your church teachings and actually serve on a jury and consider the death penalty as an option?
A: I guess I could. I would have to if I had to serve on a jury.
Q: ....let me put it another way. Do you believe in the death penalty at all?
A: No ma'am.
Q: Do you believe that you could ever personally vote to impose the death penalty in a case?

*425 A: I would have to say no right now, but I'm not in that situation. I don't know the situation of a case to answer.
Later, White responded to the court's questioning that she was not so opposed to the death penalty such that she would not consider it under any circumstance. White stated that the type of case in which she could consider the death penalty was "the lady that killed her children, her two children, I could have given her the death penalty." When the prosecution explained to White that the instant case did not involve the death of a child, but rather the stabbing death of a forty year old woman for money by a twenty year old male, her testimony was as follows:
Q: In that situation, could you have reservations in returning the death penalty, particularly in this case?
A: Yes.
Q: And would those be very-it could be a substantial impairment?
A: Yes.
In an attempt by defense counsel to rehabilitate White, the following testimony occurred:
Q: Not in an abstract case, but in this case, could you put those reservations [about the death penalty] aside, or are they so strong that they would affect you to the point that you just couldn't apply the death penalty?
A: I understand it better that you've explained it. And honestly, I could put my reservations aside.
In determining a juror's competency, a trial judge is not expected to rely upon one isolated area of voir dire. State v. O'Conner, 320 So.2d 188, 191 (La.1975). Consequently, she is not bound by a juror's answer to a particular question when that answer is inconsistent with other answers and other facts and circumstances known to the judge as a result of the entire examination. Id.; See also State v. Oliphant, 220 La. 489, 56 So.2d 846, 847 (La.1952). We again note that "unmistakable clarity" is not required to establish that a juror's views on the death penalty would prevent or substantially impair the performance of her duties. Witt, supra, 469 U.S. at 424, 105 S.Ct. at 852. In explaining why "unmistakable clarity" is not required, the Supreme Court stated:
This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge will be left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.
Id. at 425-26, 105 S.Ct. at 852.
In Witt, the Court went on to say, "`In doubtful cases, the exercise of [the trial judge's] power of observation often proves the most accurate method of ascertaining the truth.... To the sophistication and sagacity of the trial judge the law confides the duty of appraisal.'" Id. at 434, 105 S.Ct. at 857(quoting Marshall v. Lonberger, 459 U.S. 422, 434, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983) (quoting Boyd v. Boyd, 252 N.Y. 422, 169 N.E. 632, 634 (N.Y.1930))). Appellate review of the entire voir dire is essential to determine whether the trial court abused its discretion in excusing a juror. State v. Bates, 397 So.2d 1331, 1334 (La.1981).
In granting the State's cause challenge, the trial court cited the inconsistency in White's responses to questions about her ability to consider the death penalty. White's testimony that she could indeed put her reservations about capital punishment aside conflicted with remarks to the contrary on her jury questionnaire and her responses to questions asked of her by the court and by the prosecution. Her equivocal yet conflicting responses exemplify the situation described by the Supreme Court in Witt, supra. State v. Burr, 341 N.C. 263, 461 S.E.2d 602, 613 (N.C.1995). White's varying and overall *426 inconsistent testimony led to the trial judge's conclusion that she could not reasonably be expected to be fully impartial regarding the penalty to be imposed. Given the cold record before us, it is impossible for us to judge which one of White's inconsistent answers rang the most true; it is the trial court's duty to perform such an evaluation. People v. Davis, 794 P.2d 159, 205 (Colo.1990); See alsoPeople v. Millwee, 18 Cal.4th 96, 74 Cal. Rptr.2d 418, 954 P.2d 990 (Cal.1998) (trial court did not err in dismissing juror for cause where inconsistent answers left trial court with impression that juror could not follow the law); Greene v. State, 268 Ga. 47, 485 S.E.2d 741 (Ga.1997), cert. denied, ___ U.S. ___, 118 S.Ct. 568, ___ L.Ed.2d ___ (1997)(deference afforded trial court's grant of State's challenge for cause where juror gave conflicting and equivocal answers regarding her views on the death penalty); Taylor v. State, 638 So.2d 30 (Fla.1994), cert. denied, 513 U.S. 1003, 115 S.Ct. 518, 130 L.Ed.2d 424 (1994).
Thus, considering this juror's testimony as a whole, and not merely "correct" answers in isolation, the record supports the trial court's ultimate determination that White was unfit for service. Affording the trial court the deference due in this circumstance, we find that this assignment of error has no merit.

Rozlynne Black
In assignment of error 21, defendant argues that potential juror Rozlynne Black was also impermissibly excused for cause. Although not an employee at the time of trial, Black had worked at Harmony House, a juvenile correctional facility at which the defendant previously resided, during the time the defendant was a resident. Defendant asserts that Black's excusal was erroneous because her voir dire testimony indicated that she had no bias for or against the defendant.
While at Harmony House, Black had been employed in a clerical position, which required her to type social evaluations, psychiatric evaluations, and discharge summaries. She testified that she did know the defendant on sight, but that she did not know him personally. She also testified that she knew some of the individuals who were to be called as witnesses in the trial who were also Harmony House employees. She stated, however, that her relationship with them would not cause her to be biased. She further stated that although she did not remember specifically dealing with any of the defendant's records, upon hearing witness testimony, her memory of psychiatric and social evaluations might be refreshed. She acknowledged that this testimony could trigger the recollection of certain facts about the defendant's case which may not be admissible and would therefore place her in a different position than other jurors who would not be privy to the same information.
The state or the defendant may challenge a juror for cause on the ground that "the relationship, whether by ... employment,... or enmity between the juror and the defendant ... is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict." La. Code Crim. Proc. Ann. art. 797(3) (West 1998). Nevertheless, the mere relationship between a prospective juror and a defendant is not itself grounds for a challenge for cause. State v. Mills, 505 So.2d 933, 945 (La.App. 2d Cir.1987), writ. denied, 508 So.2d 65 (La. 1987). In a proper challenge for cause, the facts must reasonably lead to the conclusion that the relationship would influence the juror in arriving at a verdict. Id. Consequently, this Court has held that a challenge for cause should be granted even if the juror declares an ability to remain impartial, when the juror's response reveals facts from which bias, prejudice, or impartiality may be reasonably inferred. State v. Albert, 414 So.2d 680 (La.1982). A charge of juror bias may be removed if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. State v. Gibson, 505 So.2d 237 (La.App. 3d. Cir.1987), writ. denied, 508 So.2d 66 (La.1987). Likewise, no error is committed by a trial court's refusal to dismiss a juror who expressed some reservation about accepting the law when, after additional questioning, the juror assures the trial court that she could apply the applicable law and give the defendant a fair trial. State v. *427 Munzy, 464 So.2d 1040 (La.App. 1st Cir. 1985), writ. denied, 468 So.2d 1203 (La.1985).
Although Black declared that she was able to remain impartial, her responses revealed facts from which bias, prejudice, and impartiality could be reasonably inferred. Significantly, Black acknowledged that her employment with Harmony House could have triggered her recollection of certain facts pertaining to the defendant which may not have been admissible at trial. This is indeed a fact from which bias can be reasonably inferred despite Black's stated ability to remain impartial. Therefore, we find assignment of error 21 to have no merit.

Alleged Prosecutorial Misconduct
In assignments of error 58 and 106, the defendant alleges that the prosecutor impermissibly questioned prospective jurors by lecturing, arguing, and conditioning them during voir dire. In his brief, defendant cites to approximately fifteen supporting examples of this alleged conduct in the trial transcript. However, of those fifteen, trial counsel lodged an objection in only two of those instances. Consequently, we refer to our previous decision in State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996) for the premise that alleged errors not contemporaneously objected to by trial counsel during the guilt phase of the trial are beyond the scope of our appellate review, and we will review only the two instances in which an objection was contemporaneously lodged.
Both instances that defendant finds objectionable arose during the questioning of venireman Robert Lundholm, who was eventually selected to serve on the jury. In the first instance, the following exchange transpired:
Q: You would not exclude [under the facts of this case consideration of the death penalty]?
A: No, that's pretty cold blooded.
Q: I can analyze to you and the factors is that it's one person killing one person as opposed to the example you used out in Oklahoma City where it was a hundred and eighty-five or close to two hundred. It wasn't a rape involved. It wasn't the death of a child. It was an adult killing and adult for money and it wasn't multiple gunshot wounds, but there were multiple knife stab wounds, or the state alleges that there was.
A: Well, to me
Q: Twenty-six of them, we've alleged.
At this point, defense counsel objected. The trial court promptly sustained the objection. We first note that at the point in time the objectionable comment was made by the prosecutor, venireman Lundholm had already indicated that, under the circumstances of the case before him, he could consider the imposition of the death penalty. Moreover, the trial court sustained defendant's objection. In State v. Deboue, 552 So.2d 355 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990), this Court stated that when an objection to a remark which has been challenged as prejudicial is promptly sustained, the likelihood that the remark somehow influenced the jury is lessened. See also State v. Sharp, 418 So.2d 1344, 1349 (La.1982). The trial judge's reciting that the remark was improper and her sustaining of the objection, coupled with the fact that the improper remark had no effect on Lundholm's ability to consider the death penalty, leads us to the conclusion that the prosecutor's remark did not influence this juror's ability to render an impartial verdict.
The second objection lodged pertaining to alleged prosecutorial misconduct during Lundholm's voir dire occurred during questioning by the prosecution concerning Lundholm's earlier admission to the trial court that, although he had reservations about the death penalty, he thought he could personally sentence someone to death if "[he] were consciously able to divorce [him]self [from his] personal feelings and look at the facts." The trial court overruled defendant's objection. The applicable comment by the prosecutor is the following:
Q: ... And let me tell you why I would ask you to consider that [divorcing yourself from your feelings] might be very difficult. *428 I have seen jurors that, ... didn't have the reservations that you have or nobody expressed them as strong as you, in a very strong case, ... and I saw people spend hours deliberating and then come out and several of them on the front row joined hands and put their heads down with three of them crying. I saw another gentleman that turned his face to the wall as the verdict was read.
The purpose of voir dire is to discover grounds for challenges for cause and to secure information for the intelligent exercise of peremptory challenges. State v. Stacy, 96-0221 p. 5 (La.10/15/96), 680 So.2d 1175, 1178. A party interviewing a prospective juror may not ask a question or pose a hypothetical which would demand a commitment or pre-judgment from the juror or which would pry into the juror's opinions about issues to be resolved in the case. State v. Williams, 230 La. 1059, 89 So.2d 898, 905 (La.1956). See also, State v. Square, 257 La. 743, 244 So.2d 200, 226 (1971), judgment vacated in part, 408 U.S. 938, 92 S.Ct. 2871, 33 L.Ed.2d 760 (1972), mandate conformed to, 263 La. 291, 268 So.2d 229 (La.1972) ("Voir dire examination is designed to test the competence and impartiality of prospective jurors and may not serve to pry into their opinions concerning evidence to be offered at trial."). However, voir dire examination which goes to the determination of the qualifications of prospective jurors by testing their competency and impartiality is proper. State v. Stacy, supra, 680 So.2d at 1178; State v. Hall, 616 So.2d 664, 668 (La.1993). This Court in State v. St. Amant, 413 So.2d 1312, 1319 (La.1981) (on rehearing) held that "because of the difficulty of the concepts and values which must be understood and applied by each juror in his deliberations, counsel for each side is entitled to an opportunity to assess the personality and comprehension of each prospect as a unique human being before accepting him as a juror or challenging him for cause or peremptorily." See also State v. Dixon, 365 So.2d 1310 (La.1978). The proper scope of examination lies within the discretion of the trial court, and its ruling will not be disturbed on appeal in the absence of a clear abuse of discretion. State v. Stacy, supra, 680 So.2d at 1178; State v. Hall, supra, 616 So.2d at 668.
Trial counsel argued that the prosecutor was trying to intimidate the juror in an attempt to have him shy away from fulfilling his civic duty. Although somewhat melodramatic, we find that the prosecutor's comment had a legitimate purpose in that it was aimed at determining whether Lundholm's attitudes about the death penalty would render him unfit for service. Additionally, the fact that Lundholm eventually served on the jury, and thus did not shy away from his civic duty, the gravamen of the objection, militates against a finding that this comment in some way prejudiced the defendant.
We therefore find these assignments of error to be meritless.

Errors Alleged During the Penalty Phase

Victim Impact Testimony
In assignments of error 95, 96, 97, 99, 100, 101, 102, and 106, defendant argues that the victim impact evidence introduced during the penalty phase of trial was beyond the scope of this Court's decision in State v. Bernard, 608 So.2d 966, 972 (La.1992) and therefore requires reversal of his sentence. Defendant's argument in this respect is two fold. First, defendant argues that the prosecution erred in calling neighbors of the victim to testify as victim impact witnesses in violation of Louisiana Code of Criminal Procedure article 905.2 which reads in pertinent part, "The sentencing hearing shall focus on the circumstances of the offense, the character and propensity of the offender, and the impact that the death of the victim has had on the family members." (emphasis added). Second, defendant argues that, notwithstanding this error, the quality of the victim impact testimony exceeded the scope of relevant victim impact evidence that has been sanctioned by this Court in Bernard, supra. Trial counsel lodged no objections to the admission of victim impact evidence. However, because the errors are alleged to have occurred during the penalty phase of a capital case, such a failure does not prevent this court from reviewing them when raised for the first time on appeal. State v. Taylor, supra, 669 So.2d at 375.
*429 We first address defendant's contention that the prosecutor exceeded the scope of Bernard, supra by introducing victim impact testimony from non-family members.
In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court held that there is no per se Eighth Amendment bar to the introduction of victim impact evidence in a capital sentencing proceeding. Under this holding, a state statute may authorize the use of such evidence so long as the particular evidence does not violate the defendant's due process rights by injecting arbitrary factors into the proceeding and there is no state constitutional violation. State v. Bernard, supra, 608 So.2d at 970. Consequently, in Bernard, supra, we held that in our state "the prosecutor, within the bounds of relevance of the [capital sentencing] statute, may introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." 608 So.2d at 971.
Current article 905.2, as amended by Acts 1994, 3rd. Ex.Sess., No. 14, § 1, specifically provides for the introduction of testimony by family members of the victim:
The sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the impact that the death of the victim has had on family members.

La.Code Crim. Proc. Ann. art. 905.2(A) (West 1997) (emphasis added).
Defendant contends that the clear language of the statute forbids the testimony of neighbors, specifically in the instant case Jane and Misty Cappo, and cites the legislative history of the amendment to the statute in support of his argument.
On November 12, 1992, this Court rendered its decision in Bernard, supra. In Bernard, we did not specifically define the type of individual who would qualify to give testimony as a victim impact witness. We did, however, confine the type of evidence to be adduced to that which fell within the bounds of relevance under the capital sentencing statute. 608 So.2d at 971. Following this decision, the legislature amended Louisiana Code of Criminal Procedure article 905.2 in 1994 to allow for the introduction of victim impact evidence. HLS 94A-124, 3rd Ex.Sess.1994, HB 1. On June 6, 1994, Representative Windhorst proposed the following amendment to Art. 905.2(A):
The sentencing hearing shall focus on the circumstances of the offense, and the character and propensities of the offender, and the impact that the death of the victim has had on the family members, friends, close associates, and the community in which the victim lived.

HLS 94A-124, 3rd Ex.Sess.1994, HB 1 (original) (emphasis in original).
At some point before the bill's passage, a house floor amendment to the engrossed bill resulted in a re-engrossed version which reads as the statute does today. A "Summary of Amendments Adopted by the House," attached to the re-engrossed version of the bill notes that the amendment "delete[d] provisions requiring consideration of the impact the victim's death has had on the victim's friends, close associates, and the community in which the victim lived." HLS 94A-124, 3rd Ex.Sess.1994, HB 1 (re-engrossed).
We find that the legislative history, along with the plain language of the article, supports defendant's assertion that article 905.2 contemplates the admission of victim impact testimony by family members only. Although the Cappos clearly were very close to the victim, they do not qualify as "family" under either a traditional or a legal definition of the word.[6]See Webster's New Collegiate Dictionary 414 (G. & C. Merrimam Co. 1977) (a group of persons of common ancestry); Black's Law Dictionary 728 (West 1968) ("In most common usage, the word implies father, mother, and children, immediate blood relatives.") (citation omitted). Bernard, supra, confines admissible *430 victim impact testimony to that which is deemed relevant by the capital sentencing statute. Therefore, in the instant case, it was indeed beyond the scope of Bernard to adduce victim impact testimony from non-family members. The adducement of victim impact evidence which exceeds the scope of Bernard is reviewed under a harmless error standard. State v. Williams, supra, 708 So.2d at 722; State v. Taylor, supra, 669 So.2d at 371. An error is harmless if the verdict rendered is surely unattributable to the error. State v. Taylor, supra, 669 So.2d at 371. Finding the testimony of Jane and Misty Cappo to be error, we now turn to the effect of this error on the proceedings.
In the instant case, Jane and Misty Cappo, the victim's neighbors, were called to testify about what impact Regina Slonim's murder had on their lives. The remainder of the victim impact testimony was given by the victim's brother, Scott Slonim. The evidence showed that, because the victim's brother lived in Chicago and her parents were deceased, Regina Slonim developed a close relationship with the Cappos, shared holidays with them, and was an active participant in their family life. Jane Cappo testified about how she first met the victim and how their relationship developed over the ten years prior to her death. She also testified about how she learned of the victim's death and the emotional impact it had on her. Misty Cappo, Jane's daughter, testified that the victim was like a "sister and my mom." She also testified about how she learned of the victim's death and how it impacted her emotionally. Scott Slonim testified about his childhood with the victim, the victim's relationship with his children, and how the news of her death affected his family.
Jane and Misty Cappo's testimony comprised less than half of the entire victim impact testimony adduced during the penalty phase. A review of their testimony reveals that it did not contain information that Bernard has deemed prejudicial. They did not offer opinions about the heinous nature of the crime or of the murderer nor did their testimony evolve into "detailed descriptions" or "particularized narrations" of the victims' good qualities or the witnesses' own suffering. Bernard, supra, 608 So.2d at 970, 972. Consequently, we find that but for the fact that Jane and Misty Cappo were not "family," the quality of their testimony was within the scope of Bernard. Thus, the fact that these witnesses were not "family" did not interject an arbitrary factor in the proceedings which rendered the proceedings fundamentally unfair to the defendant. In ascertaining whether there was any prejudicial effect on the defendant, we also note that the jury was properly charged concerning the weight to be afforded victim impact testimony.[7] Therefore, the permissible quality of Jane and Misty Cappo's testimony, coupled with the proper instruction by the trial court, leads us to conclude that the jury's verdict was surely unattributable to the erroneous admission of this evidence. Its introduction was harmless.[8]
*431 We next address defendant's argument that, in addition to the erroneous admission of the aforementioned testimony, certain aspects of the victim impact testimony exceeded the scope of Bernard.
As we have previously mentioned, Payne, supra, held that the Eighth Amendment erects no constitutional bar to the admission of victim impact testimony. In Payne, the Court further reasoned that because no mitigating evidence can be excluded from the jury's purview, the prosecutor should be allowed to counter defense evidence with testimony and argument "designed to show ... each victim's uniqueness as an individual human being." Id. at 824, 111 S.Ct. at 2607. Accordingly, we have held admissible two broad categories of victim-impact evidence: (1) information revealing the individuality of the victim; and (2) information revealing the impact of the crime on the victim's survivors. State v. Taylor, supra, 669 So.2d at 369-370; State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670 (1996); State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995). While some evidence depicting the impact of the loss on the victim's survivors is permitted, the evidence may not descend into detailed descriptions of the good qualities of the victim and particularized narrations of the sufferings of the survivors which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder. State v. Williams, 96-1023, p. 22 (La.1/21/98), 708 So.2d 703; State v. Taylor, supra, 669 So.2d at 370-371; State v. Bernard, supra, 608 So.2d 966, 972 (La.1992).
Defendant specifically argues that the prosecutor exceeded the scope of Bernard by the following: (1) asking the victim impact witnesses questions concerning the victim's intelligence; (2) attempting to elicit "canine victim impact" testimony; and (3) asking the witnesses if they had any sympathy for the defendant.
Defendant asserts that, in contravention of a ruling by the trial court, the prosecutor elicited testimony about the victim's I.Q. The record reveals that prior to trial at the Bernard hearing, the prosecutor sought introduction of records of the victim's I.Q. The trial court, in ruling on this issue, stated "I don't believe the victim's I.Q. ....is relevant or probative of whether or not this person in this particular case should be sentenced to death or not. ...." We find it unclear from her ruling whether the trial court judge was referring specifically to admissibility of records of the victim's I.Q. or mention of her intelligence level in general.
At trial, the prosecutor did not seek to elicit detailed testimony concerning the victim's I.Q. The testimony that the defendant finds objectionable occurred when the prosecutor asked two of the witnesses whether the victim was a "smart person." When this question was asked of the victim's brother, he responded, "She was. And I think at some point she had been tested for I.Q. and she actually did have a higher I.Q. [than me]." We note that during trial the prosecutor did not seek to introduce records of the victim's I.Q.
Regina Slonim was apparently a very bright woman who had earned a double major in French and Russian and had also completed two years of law school at Louisiana State University. We find that testimony regarding her intelligence was intended to show the "victim's uniqueness as an individual human being," which is one of the categories of victim impact evidence sanctioned by this Court. See Payne, supra, 111 S.Ct. at 2076; State v. Bernard, 608 So.2d at 969. Therefore, to the extent the trial court's ruling could be interpreted to exclude any reference to this particular victim's intelligence level, it was wrong. Scott Slonim's brief response to the prosecutor's question cannot properly be characterized as a "detailed description of the good qualit[y] of the victim... which go[es] beyond the purpose of *432 showing the victim's individual identity." We therefore find that this testimony is within the scope of Bernard.
Defendant next complains of the prosecution's introduction of "canine victim impact" testimony in contravention of the trial court's ruling. The trial court specifically stated, "... I don't think the impact of [the victim's] death on her animals is the kind of thing that Bernard would sanction....so any testimony about the animals suffering and the animals having to be put to death because of their grief over the loss of their master I think would be inappropriate." During trial, the prosecutor asked a victim impact witness whether the victim had any pets. She responded that the victim had two dogs at the time of her death and one cat that had died shortly before. No testimony was ever elicited to the effect that the pets had to be euthanised over the grief of losing their master, and therefore, we find that the trial court's ruling was not violated. Furthermore, the brief amount of testimony which simply characterized the victim a pet owner speaks to the uniqueness of this victim as an individual and was therefore permissibly within the scope of Bernard.
Finally, the defendant argues that this prosecutor exceeded the scope of Bernard by asking two victim impact witnesses whether they had any sympathy for the defendant. Both witnesses answered in the negative. In Taylor, supra, we employed a harmless error standard to review victim impact witness comments on the appropriateness of the death penalty. 669 So.2d at 371. We note that we have addressed this same argument with respect to this same prosecutor in two prior cases. See State v. Williams, supra, 708 So.2d at 722; State v. Taylor, supra, 669 So.2d at 371. In both instances, we assumed, without deciding, that the victim impact statements were indeed outside the scope of Bernard. However, we found any potential error to be harmless in light of the fact that it should come as no surprise to the jury that the victim's family has no sympathy for the defendant. Williams, supra, 708 So.2d at 722; Taylor, supra, 669 So.2d at 371. We commented that, in fact, it may be more surprising for the jury to hear that the victim's family has some sympathy for the defendant. Additionally, in the instant case, as in Taylor, supra, the trial court instructed the jury on the proper weight to be afforded victim impact testimony. In Taylor, we found this properly given instruction to weigh in support of our conclusion that the error was harmless. 669 So.2d at 371. Based on our prior jurisprudence, even in light of this improper question by the prosecutor, we find that the verdict returned by the jury was clearly unattributable to these unremarkable "sympathy" statements.

Prosecutorial Misconduct
In assignments of error 94 and 106 defendant argues for reversal of his sentence based upon alleged prosecutorial misconduct during the penalty phase of trial. Specifically, defendant alleges that the prosecutor misled the jurors as to the facts of the case and the nature and applicability of mitigating circumstances during closing argument. In the penalty phase of a capital case, this Court reviews all errors alleged regardless of the contemporaneous lodging of an objection by trial counsel. See State v. Taylor, supra.
The scope of proper closing argument is confined to "evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom and to the law applicable to the case." La.Code Crim. Proc. Ann. art. 774 (West 1998). However, a prosecutor is afforded considerable latitude in making closing arguments. State v. Byrne, 483 So.2d 564 (La. 1986), cert. denied, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); State v. Morris, 404 So.2d 1186 (La.1981). As a general rule, the prosecutor may not use closing argument as a vehicle to express his personal opinions about the defendant when his opinion is expressed in a manner that the jury may understand has been formed from evidence outside of the record. State v. Procell, 365 So.2d 484, 489 (La.1978), cert. denied, 441 U.S. 944, 99 S.Ct. 2164, 60 L.Ed.2d 1046 (1979). Such an opinion is permissible if the prosecutor refers to, or it is apparent that his opinion is based on, the evidence of record. Id. See also State v. Hicks, 395 So.2d 790, *433 797-98 (La.1981); State v. Bretz, 394 So.2d 245, 248 (La.1981), cert. denied, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981).
This Court has recognized as a matter of well-settled law that the prosecutor has the right to "press upon the jury any view of the case arising out of the evidence the Supreme Court is bound to credit jurors with common intelligence, conscientiousness, and sense of duty." State v. Alexander, 215 La. 245, 40 So.2d 232, 234 (La.1949). Even when we have found the prosecutor to have exceeded the proper bounds of argument, this Court has often criticized the improper arguments without finding that they constituted reversible error. See, e.g. Byrne, supra; State v. Jarman, 445 So.2d 1184 (La. 1984); State v. Messer, 408 So.2d 1354 (La. 1982). The standard by which this Court determines whether improper closing argument constitutes reversible error is whether it is "firmly convinced that the jury was influenced by the remarks and that they contributed to the verdict." State v. Sanders, 93-0001 p. 16-17 (La.11/30/94), 648 So.2d 1272, 1285-86, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996); Byrne, 483 So.2d at 572; Messer, 408 So.2d at 1357. Defendant argues that the prosecutor exceeded the scope of proper closing argument when he discredited evidence pertaining to the following mitigating circumstances: the defendant's youth; no prior significant criminal history; and decreased mental capacity at the time of the crime. See La.Code Crim. Proc. Ann. art. 905.5(a),(e),(f) (West 1997).
Defendant first argues that the prosecutor's closing argument contravened Louisiana Code of Criminal Procedure article 905.5(f), under which the jury is required to consider the youth of the defendant as a mitigating circumstance, by turning the defendant's youth into an aggravating circumstance. The prosecutor stated the following: "Youth, if anything, is an advantage....[]youth is an advantage if you are going to be in knife fight. You're stronger and you're quicker, you're more agile, you got more energy. Youth helped him."
First, we note that the prosecutor's argument appears to be a fair comment upon the evidence. The victim in this crime was a forty year-old woman who was described in the autopsy report as "moderately obese." The defendant was a twenty year-old male. The evidence showed that there was a violent struggle engaged in by the victim and the defendant. The argument by the prosecution that the defendant's youth helped him overcome the victim's defenses can reasonably be drawn from the evidence. Second, defendant's argument that this comment caused the jury to abandon its obligation to consider the defendant's youth as a mitigating factor is mere speculation about what inferences the jury drew from this statement.
Next, defendant argues that the prosecutor impermissibly drew upon his own personal experience when commenting on the abuse the defendant suffered at the hands of his father as a young child. The defendant's father testified that he was an intravenous drug user and had used drugs around the defendant when the defendant was a child. Defendant's mother left the home after much physical abuse, taking defendant's younger brother, but leaving defendant and his older brother to be raised by his drug addicted, abusive father. Defendant cites as error the prosecutor's resort to his own childhood environment in an attempt to disparage the defendant's childhood suffering when the prosecutor stated, "... my father was born in 1900 and he believes in spare the rod and spoil the child. I joke with people that I grew up with before they invented child abuse. And I'm not making fun. My daddy warned you one time and you keep on, the second time you don't get a warning."
This same prosecutor's resort to personal experience was addressed in our recent decision in State v. Williams, supra. In Williams, we noted that prosecutors may not resort to personal experience or turn an argument into a plebiscite on crime. 708 So.2d at 716. In this case, as in Williams, we find that this prosecutor's comments were inappropriate. However, we are not firmly convinced that these remarks influenced the jury and contributed to its verdict. The fact that the prosecutor had a strict father can hardly be said to have imperiled the jury's *434 perception of the defendant's father as abusive. To believe that the jury could not draw the obvious distinction between strict discipline and child abuse would require this Court to find that the jurors were devoid of the common intelligence and sense of duty that is properly credited them. We therefore find that this comment, although improper, did not unfairly prejudice the defendant.
Next, defendant argues that the prosecutor misstated evidence and misrepresented testimony concerning the defendant's capacity to appreciate the criminality of his conduct at the time of the murder. See La. C. Cr. P. art. 905.5(e) (West 1997). Defendant argues that the prosecutor misstated the evidence when he argued to the jury that an I.Q. of 80 was "completely normal" in an attempt to demonstrate that the defendant, who had a full scale I.Q. of 76, did not suffer from decreased mental capacity at the time of the crime. Specifically, the prosecutor, noting the margin of error for the I.Q. test, argued that the defendant's full scale I.Q., if adjusted upwards three points for potential test error, would be 79, one point away from "normal." The attempt by the prosecutor to characterize an I.Q. of 80 as "normal" apparently stems from expert testimony elicited at trial that an I.Q. of 80-100 is "average." Assuming, but not deciding, that this statement by the prosecutor was a misstatement of the evidence, we do not find this isolated comment to be so prejudicial as to require reversal of the defendant's sentence. Further militating against such a conclusion is the fact that the trial court properly instructed the jury that the attorneys' arguments were not evidence, and that their arguments could be rejected by the jury if they failed to coincide with whatever facts were found to be proven or disproven at trial. See State v. Lee, 364 So.2d 1024, 1030 (La.1978). In light of this proper instruction and the relative brevity of the remark we are not "firmly convinced" that this statement contributed to the jury's verdict.
Defendant next argues that the prosecutor again mischaracterized expert testimony when he argued that the defendant lied to his psychiatrist "claiming somewhat of a misguided self-defense motive." This statement by the prosecutor also finds support in the evidence adduced at trial. The defendant indicated to his psychiatrist that he initially intended only to rob the victim, and it was when she started fighting back that he "panicked" and "all [he] knew what to do was stab her." It is not unreasonable to conclude from this statement that the defendant was indeed attempting to color the murder as a "misguided self-defense motive." This was a fair argument based on the evidence presented and was not outside the scope of proper argument.
Next, defendant argues that the prosecutor misrepresented the testimony of defendant's psychiatrist when he stated that "Dr. Ware thought [the defendant] was telling the truth" about the facts of the murder during his psychiatric interview. Defendant argues that Dr. Ware did not state that he thought the defendant was telling the truth. Dr. Ware only stated on two different occasions, once on direct examination and once on cross-examination, that he thought the defendant was truthful in the interview. This argument is hardly a serious one and has no merit.
Defendant further argues that the prosecutor misstated the law when he characterized the mitigating circumstance of decreased mental capacity as tantamount to the defendant's ability to know right from wrong. Specifically, the prosecutor stated, "At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was impaired as a result of mental disease or defect. Two defense psychiatrists testified that [defendant] had the capacity to know that when he murdered Regina Slonim it was wrong."
In State v. English, 367 So.2d 815, 819 (La.1979), this Court noted that while the test of the defendant's criminal responsibility is provided solely by a right or wrong test insofar as the issue is the defendant's guilt, once guilt has been established another dimension of his mental condition comes into play as affecting whether the jury will recommend that he be sentenced to death. At that *435 time, the jury may consider as a mitigating circumstance that at the time of the offense the defendant's mental capacity was impaired to the extent that he was unable to appreciate the criminality of his conduct and to conform that conduct to the law. Id. While this isolated statement by the prosecutor does appear to blur the distinction between the two standards, when taken as a whole, the prosecutor's argument in this regard indicates that the distinction was properly drawn. For example, after detailing testimony which indicated that the defendant did know right from wrong at the time of the murder, the prosecutor then went on to argue the following regarding decreased mental capacity, "to have that recall [of the facts of the murder as told to police] that detailed, means while it was going on he had to have a fairly clear mind, he had to have good insight of what was going on or he couldn't have provided [the police] that." Considering the propriety of the argument as whole, we are not firmly convinced that the improper comment influenced and contributed to the jury's verdict.
Defendant next argues that the prosecutor improperly argued that certain mitigating circumstances were not worthy of consideration by the jury. We have recognized that a jury in a capital case is required to consider evidence of any mitigating circumstances and to weigh it against the statutory aggravating circumstances so found before recommending a penalty. State v. Willie, 410 So.2d 1019 (La.1982); State v. Sonnier, 402 So.2d 650 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983); See also La. C. Cr. P. art. 905.5 (West 1997) ("The following shall be considered mitigating circumstances ...") (emphasis added). In Ward v. Whitley, 21 F.3d 1355, 1364 (5th Cir.1994), cert. denied, 513 U.S. 1192, 115 S.Ct. 1257, 131 L.Ed.2d 137 (1995), the Fifth Circuit in interpreting Louisiana law noted that "[t]here is a fine line between [a prosecutor's] argument that a statutory mitigating circumstance merits no weight in the jury's ultimate decision and the argument that the mitigating circumstance should not be considered or is not mitigating. The former is permissible under Louisiana law; the latter is not."
In Ward, the Fifth Circuit upheld a conviction in which the prosecutor, during closing argument, essentially argued that voluntary intoxication should not mitigate the death penalty. The prosecutor in Ward argued, "Think of the message you send to this community if you are going to buy that theory and buy that line of nonsense. It makes it pretty convenient that if I want to go kill somebody the best thing for me to do is go out and get a pint of booze first, drink it down and then I can come to Court and say I was drunk." Id. at 1363. The Fifth Circuit held that even though the prosecutor crossed the line with this argument, the defendant failed to show that there was an abridgement of due process which rendered the proceeding fundamentally unfair. In so holding, the court noted that the trial court had properly instructed the jury that intoxication was a mitigating circumstance, that the attorneys' arguments were not evidence, and that it was bound to apply the law as given by the trial court. Id.
In the instant case, defendant first argues that the prosecutor impermissibly argued to the jury that they should not consider the defendant's repentance as a mitigating circumstance under Louisiana Code of Criminal Procedure article 905.5(h), "any other relevant mitigating circumstance." Defendant argues that repentance is clearly mitigating, and in support of this argument, he cites the United States Sentencing Guidelines for the proposition that downward sentence departures are allowed where defendants have accepted responsibility for their crimes. USSG § 3E1.1 (1998). The prosecutor in the instant case, however, did not argue that repentance was not mitigating. Rather his argument struck at the issue of whether the defendant was indeed repentant. The defendant had told two friends several months after the murder that he "enjoyed" killing Regina Slonim and that he was "glad he did it." Both friends testified to these conversations at trial and indicated that the defendant expressed no remorse. Clearly, this is not a case, as in Ward, supra, where the prosecutor is arguing that repentance is not a mitigating circumstance and is not worthy of consideration by the jury.
*436 Additionally, in applying the United States Sentencing Guidelines cited by defendant, the Ninth Circuit in U.S. v. Daly, 974 F.2d 1215, 1218 (9th Cir.1992) stated, "It is not clearly erroneous to deny the reduction [of the defendant's sentence] if the defendant admits he committed the criminal behavior but does not exhibit sincere remorse or contrition for having done so." Further, the Eighth Circuit held in U.S. v. Davila, 964 F.2d 778, 784 (8th Cir.1992), cert. denied, 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 358 (1992), that the defendant's voluntary admission of involvement of the offense does not automatically entitle him to an acceptance of responsibility sentence reduction. In Davila, the court noted that it appeared that Davila's primary motive in cooperating with authorities was to obtain a reduction in his sentence and was not due to a sense of remorse over his past conduct. Id. In light of this jurisprudence and the defendant's own admissions, the prosecutor's argument that the defendant's confession was not tantamount to contrition was proper and was based on evidence adduced at trial. Defendant's argument has no merit.
Finally, defendant argues that the prosecutor committed reversible error when he stated, "The evidence shows that [decreased mental capacity is] not there as a mitigating circumstance, it doesn't exist. If it did, it wouldn't justify this crime, it wouldn't mitigate this crime." We also note that after making the statement of which the defendant complains, the prosecutor then argued, "The facts show you that [a crime committed while under decreased mental capacity] didn't happen. And if it did, it is but a mitigating circumstance that the law says you can reject and give him the death penalty if you think the totality of the circumstances justify it."
The prosecutor's argument that this mitigating circumstance did not "exist" was not error. Notably, the trial court's instructions properly charged the jury, "Whether an aggravating or mitigating circumstance exists is a fact for you to determine based on the evidence presented." This Court has previously sanctioned similar jury charges. See State v. Eaton, 524 So.2d 1194 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989) (no error in charge that jury must find "that a mitigating circumstance exists if there is any substantial evidence to support it.") (emphasis added). Therefore, to argue that a particular mitigating circumstance did not exist based upon the evidence adduced at trial was not improper.
Furthermore, the prosecutor's argument that mental incapacity, even if found by the jury to exist, was not mitigating under the circumstances, was also not improper. The role of the jury with regard to the consideration of mitigating circumstances is to consider evidence of those mitigating factors and to weigh it against the aggravating circumstances before recommending a penalty. See State v. Willie, supra, 410 So.2d at 1033; State v. Sonnier, supra, 402 So.2d at 657. Thus, the fact that the jury finds that a mitigating circumstance exists does not therefore require it to find that its existence necessarily mitigates the penalty. Here, the prosecutor's argument that the mitigating circumstance of decreased mental capacity merited no weight in the jury's ultimate decision under the facts of the case before it was not improper under Louisiana law. Moreover, what distinguishes this case from Ward, supra, is that the prosecutor in the instant case couched the mitigation argument in the factual context of the case before him, "does not mitigate this crime," and, importantly, was not making a generalized argument that decreased mental capacity is not a valid mitigating circumstance.
For the foregoing reasons, we find that assignments of error 94 and 106 have no merit.

Capital Sentence Review
Under Louisiana Code of Criminal Procedure article 905.9 and Louisiana Supreme Court Rule 28, this Court reviews every sentence of death imposed by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice, or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, *437 considering both the offense and the offender.

Passion, Prejudice, or Other Arbitrary Factors
The defendant, in prior assignments of error, claimed that the prosecutor's improper remarks during closing argument and the introduction of improper victim impact evidence interjected an arbitrary factor into the proceedings. We have already found those individual arguments to be without merit, and we likewise find the jury did not impose the sentence under the influence of passion, prejudice, or other arbitrary factors. Furthermore, the record does not appear to show any indicia of passion, prejudice or arbitrariness.

Aggravating Circumstances
As demonstrated by the jury's verdict during the guilt phase, the State presented sufficient evidence to prove beyond a reasonable doubt that the defendant was engaged in the perpetration of an armed robbery when he killed the victim. We also find sufficient evidence in the record that this crime was committed in an especially heinous, atrocious, and cruel manner. We have held that the statutory aggravating circumstance of heinousness is properly found when there exists elements of torture, pitiless infliction of unnecessary pain, or serious bodily abuse prior to death. See State v. Brogdon, 457 So.2d 616, 630 (La.1984); State v. Sawyer, 422 So.2d 95 (La.1982). We have also held that the murder must be one in which the death was particularly painful and one carried out in an inhumane manner. State v. Baldwin, 388 So.2d 664 (La.1980). We rejected in State v. Taylor, 422 So.2d 109, (La.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983) the argument that the defendant's intent controls the finding of this aggravating circumstance. As we noted in Taylor, at some point, the physical abuse of the victim becomes so great that it reasonably supports the finding of torture or the pitiless infliction of pain although the defendant may have tried his best to dispatch the victim quickly. Significantly, Taylor involved the death of a victim who was stabbed twenty times and left to die in a car trunk.
The facts of the case before us indicate that Regina Slonim was stabbed approximately twenty-six times with a steak knife. She engaged the defendant in a violent struggle for her life. The coroner testified that the she was conscious throughout most of the attack and would have been aware that she was dying and was unable to scream. Even more telling is the defendant's admission that he "stomped" on her face several times after she appeared dead to ensure that in fact she was. In light of these facts and in light of the prior jurisprudence, we find that the State has proved that the instant murder was indeed committed in an especially heinous, atrocious, and cruel manner.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692 (La.1990). In the instant case, defendant contends that his sentence is unconstitutionally excessive and disproportionate to other sentences rendered in East Baton Rouge Parish. This Court, however, has vacated only one capital sentence on grounds it was disproportionate to the offense and the circumstances of the offender, State v. Sonnier, 380 So.2d 1 (La.1979), although it effectively decapitalized another death penalty reversal on other grounds. See State v. Weiland, 505 So.2d 702 (La.1987) (on remand, the state reduced the charge to second degree murder and the jury returned a verdict of manslaughter).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises.
Jurors in the Nineteenth Judicial District Court, which comprises East Baton Rouge Parish, have recommended imposition of the death penalty on approximately 14 occasions. Several of the salient features of the instant case make it similar enough to other death sentences recommended by juries in the 19th *438 JDC that defendant's sentence is not disproportionate. See e.g. State v. Clark, 387 So.2d 1124 (La.1980), cert.denied, 449 U.S. 1103, 101 S.Ct. 900, 66 L.Ed.2d 830 (1981), reversed on collateral grounds, Clark v. Louisiana State Penitentiary, 694 F.2d 75 (5th Cir.1982); State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278 (defendant broke into the victims' home, armed himself with a kitchen knife and stabbed the two elderly victims to death) (convictions reversed and sentences vacated; trial court erred in failing to sustain defendant's challenge for cause to an objectionable juror); State v. Robertson, 97-0177 (La.3/6/98), 712 So.2d 8 (convictions and sentences affirmed), reh'g denied, (La.4/3/98).
Furthermore, considering the fact that this case is an armed robbery and the cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, it is nearly impossible to conclude that the sentence of death is disproportionate in this case. See State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326; State v. Lindsey, 543 So.2d 886 (La.1989); State v. Messiah, 538 So.2d 175 (La.1988).[9] Thus, although counsel argues correctly in his Sentence Review Memorandum that proportionality review should include all similar first-degree murder prosecutions including those which resulted in non-capital verdicts and/or sentences, the relevant pool of capital sentences based in part or entirely on armed robbery murder is now so large that this defendant's sentence does not reflect the wanton and freakish infliction of capital punishment, no matter how large the relevant pool of similar non-capital cases.
The Uniform Capital Sentence Report reveals the defendant is a white male born on December 22, 1974 to Billy Frost and Anne Austin and is the middle child of three boys. He was twenty years old at the time of the offense. His parents never married. His mother left the home after years of physical abuse, taking the youngest child with her, but leaving the two older boys, one of which was the defendant, with their drug addicted father. His mother severed all ties with the defendant when he was fourteen. Both parents are still living; however, neither parent has had contact with the defendant for many years. Defendant has never been married and has no children. His I.Q. was assessed by the defense psychiatrist at 76. Defendant's work history includes his position as a maintenance worker on the U.S.S. Kidd and the odd jobs he performed at the Howard Johnson's. In an evaluation performed by defense expert Dr. Ware, defendant was diagnosed with major depressive disorder and schizotypal personalty traits. Dr. Ware indicated that the defendant was "reacting and in a panic state at the time he committed the charges against him." Defendant's criminal history includes an adjudication of child in need of supervision in 1990, and three delinquency adjudications, all in 1991, unauthorized entry of a residence, attempted unauthorized entry of a residence, and illegal possession of stolen things.
In light of this review, the sentence is not disproportionate.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by LSA-RS 15:567, until either (a) the defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari and either (i) defendant, having filed *439 for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.
AFFIRMED.
KIMBALL, J., additionally concurs and assigns reasons.
TRAYLOR, J., additionally concurs for reasons assigned by KIMBALL, J.
KIMBALL, Justice, additionally concurring.
I concur in the result reached by the majority in this case but write separately because I believe this Court should revisit the issue of whether the contemporaneous objection rule should apply to the penalty phase of a capital trial as well as to the guilt phase. In State v. Smith, 554 So.2d 676, 678 (La. 1989), we stated "[i]n a case involving capital punishment anything less than this court's careful consideration of the entire record for possible prejudicial error would not afford an adequate remedy by due process of law and justice." Thus, in Smith, we expressly expanded our review of capital cases to examination of the entire record for possible prejudicial error, nullifying the legislative pronouncement in Louisiana Code of Criminal Procedure Article 841(A) requiring a contemporaneous objection.
The Louisiana Constitution of 1974, Article I, Section 20, Louisiana Code of Criminal Procedure Article 905.9, and Supreme Court Rule 28, mandate that this Court review every capital sentence to determine if it is constitutionally excessive by examining the record for evidence of passion, prejudice, or arbitrary factors which may have contributed to the sentence of death. If an error was committed below, of such magnitude that either the verdict or the sentencing decision was affected, it would be remedied upon this Court's mandatory direct review. In light of these provisions, the "expansion" of our review in Smith, supra, 554 So.2d 676, was unnecessary and was properly overruled by State v. Taylor, 669 So.2d 364, 369 (La.1996), wherein we stated "[t]his Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not."
I see no benefit nor logic to imposing the contemporaneous objection rule in one of the two phases of the capital trial and not in the other. Full reimposition of the contemporaneous objection rule to both phases of the capital trial would in no way jeopardize the fundamental fairness of the trial process as any error occurring below that injected passion, prejudice, or an arbitrary factor into the decision would be ferreted out upon our already stringent direct review. Accordingly, I would extend Taylor, supra, 669 So.2d at 369, to the penalty phase as well, imposing a uniform contemporaneous objection rule consistent with the legislative mandate of Louisiana Code of Criminal Procedure Article 841(A).
CALOGERO, C.J., concurring in the denial of the rehearing.
The defendant has applied for rehearing in this matter taking issue with language used in the unpublished appendix to the majority opinion responding to his argument that cumulative error warrants reversal of his death sentence and or conviction. This Court has found that none of the alleged errors were meritorious, that what minor errors did take place were harmless, and that the cumulative effect of such minor errors did not give rise to reversible error, so that the defendant was not deprived of his right to a fair trial. The particular statement in the appendix about which the defendant complains will be corrected accordingly.
NOTES
[*] VICTORY, J. not on panel. See Rule IV, Part 2, Section 3.
[1] Defendant stated in his confession that he had recently lost his job with Howard Johnson's and owed the hotel $800. He felt his only option was to rob the hotel, which would afford him enough money to buy substantial amounts of marijuana to sell on the streets.
[2] Police, in a continuing effort to build a case against the defendant, found that a corner torn from a five dollar bill at the crime scene matched a bloodied five dollar bill found in the defendant's pocket at the time of his arrest. Police were also able to match a blood print left on the key to the safe deposit box to the pattern on latex gloves commonly used at the defendant's place of employment.
[3] Arguments not addressed in this published opinion are non-meritorious and are governed by clearly established principles of law. They will be discussed in an appendix to the opinion and not published in the law reports.
[4] Appellate counsel for defendant, in argued assignments of error 2, 16, 21, 25, 37, 40, 43, 44, 46, 47, 50, 51, 53, and unargued assignments of error 3, 4, 6, 7, 10, 12, 15, 17, 18, 20, 22, 23, 24, 26, 29, 31, 32, 33, 36, 38, 39, 41, 42, 45, 49, 52, 54, 55, and 56, asserts that, although trial counsel failed to lodge an objection, certain jurors were impermissibly excluded by the trial court. The instant case was tried prior to our decision in State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996), in which we held that the failure to contemporaneously object during the guilt phase of a capital trial precluded our review of an alleged error on appeal. While the defendant argues that he is prejudiced by a retroactive application of Taylor, we note that this Court has applied Taylor retroactively to the failure to object during voir dire in State v. Williams, 96-1023, p. 2 (La.1/21/98), 708 So.2d 703. In Williams, trial was also held prior to our decision in Taylor and was therefore conducted without benefit of that ruling. That fact, however, did not preclude us from holding Taylor applicable. Therefore, we likewise decline to address these assignments of error in the instant case.
[5] Appellate counsel erroneously asserts that trial counsel failed to object to the dismissal of venirepersons Valerie White and Rozlynne Black. A reading of the record shows, however, that trial counsel did object to their excusal.
[6] Consequently, we reserve for another day the question of whether non-family members may testify in instances when no relatives are alive or known, as this issue is not presented by the instant case.
[7] The trial court charged the jury:

You have heard testimony in this case from survivors of the victim. These persons are called victim impact witnesses. Evidence adduced from a victim impact witness is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question. The witness, however, is not called into court for the purpose of deciding the penalty in the case. You, the jurors, are the ones who in law must bear the responsibility of deciding the penalty to be received by the defendant.
[8] Other states that have addressed this very issue have also found that the erroneous introduction of victim impact testimony from persons who were statutorily precluded from testifying did not require reversal of the defendant's sentence. See Wood v. State, 111 Nev. 428, 892 P.2d 944, 945 (Nev.1995); State v. Sumpter, 438 N.W.2d 6 (Iowa, 1989). We note that the Supreme Court of Nevada initially held in Castillo v. State, 110 Nev. 535, 874 P.2d 1252 (Nevada1994) that the introduction of victim impact witnesses who did not quality as "immediate family", under the statute was indeed error but deemed that error harmless. Subsequently, that holding was disapproved of in Wood v. State, 111 Nev. 428, 892 P.2d 944 (Nev.1995). In Wood, the Court held that the fact that the state statute granted certain victims the right to express their views before sentencing did not limit a sentencing court's discretion to receive other admissible evidence in that regard. Consequently, the Court held that although the victim's mother did not qualify as a "victim" as defined by the applicable state statute, the trial court did not err in considering her testimony. In so holding, the Court noted that Nevada's victim impact statute was similar in scope to statutes enacted in Arizona and California, which have been given an expansive interpretation by courts in those jurisdictions and have been held to expand victim's rights as opposed to limiting them. Id. at 946.
[9] Jurors in the 19th JDC have returned death sentences in the following cases involving armed robbery: State v. Brumfield, Docket # 1-93-865 & State v. Broadway, Docket # X-XX-XXXX (appeals pending) (Defendants were convicted of the first degree murder of Corporal Betty Smothers, who was escorting Piggly Wiggly Grocery Store Manager Kimen Lee to the bank, when Broadway and Brumfield opened fire on the car); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865 (The seventeen year old defendant kidnapped the victim while stealing his truck and ultimately drove him to a secluded area and shot him three times in the head); State v. Scales, 93-2003 (La.5/22/95); 655 So.2d 1326 (The nineteen year old defendant, while engaged in the armed robbery of a Church's Fried Chicken, shot and killed one of the employees); State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364 (During the armed robbery of the Cajun Fried Chicken restaurant where defendant had previously been an employee, he shot and killed one employee and shot and permanently disabled and paralyzed another); State v. Williams, 383 So.2d 369 (La.1980) (defendant shot and killed the victim during an armed robbery of an A & P Grocery Store).