_JjPICKETT, Judge.

FACTS

On January 19, 1999, Eddie Carnline was found dead in his home. The autopsy determined he died the evening before as the result of a single gunshot wound to the head by a small caliber weapon.
On November 8, 1999, the defendant was indicted on one count of first degree murder. Following a trial by jury, the defendant was convicted of first degree murder. The state did not seek the death penalty in this case.
A Motion for Post-Verdict Judgment of Acquittal and a Motion for a New Trial were filed on behalf of the defendant on July 26, 2000. On August 23, 2000, an Amended Motion for a New Trial was filed.
On August 30, 2000, the defendant’s motions for post-verdict judgment of acquittal new trial were denied by the trial judge. That same day, the defendant was sentenced to life imprisonment without the benefit of parole, probation, or suspension of sentence. The trial judge granted the defendant’s oral and written motions for appeal.

APPLICABLE LAW

The defendant argues in his sole assignment of error that the evidence presented by the state was insufficient to convince a rational trier of fact, beyond a reasonable doubt, that he committed the offense of first degree murder.
“When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential l2elements of the crime proven beyond a reasonable doubt.” Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
The jury used both direct and circumstantial evidence to convict the defen *37 dant of first degree murder in the instant case. The rule governing circumstantial evidence is as follows:
When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 mandates that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.
State v. Rosiere, 488 So.2d 965, 968 (La.1986).
In the present case, the defendant was indicted for first degree murder. The indictment of first degree murder was predicated on the commission of either an armed robbery or simple robbery during which the victim was killed. Accordingly, the statutes governing this case are La. R.S. 14:30(A)(1), La.R.S. 14:64 and La.R.S. 14:65.
La.R.S. 14:30(A)(1) provides as follows:
A. First degree murder is the killing of a human being:
(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of ... armed robbery, ... or simple robbery.
La.R.S. 14:64 defines armed robbery as the following:
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
|3To find that the defendant committed an armed robbery, the evidence has to establish beyond a reasonable doubt that the defendant used a dangerous weapon to commit the robbery. A dangerous weapon is “any gas, liquid or other substance or instrumentality, which in the manner used, is calculated or likely to produce death or great bodily harm.” La.R.S. 14:2(3).
La.R.S. 14:65 defines simple robbery as follows:
A. Simple robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, but not armed with a dangerous weapon.
As to the element of specific intent, La.R.S. 14:10(1) defines specific criminal intent as “that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act.” Intent is a question of fact but need not be proven as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526. Specific intent to kill may be inferred from a defendant’s act of pointing a gun and firing at a person. State v. Seals, 95-305 (La.11/25/96); 684 So.2d 368.
In order to convict the defendant of first degree murder, the state had the burden of proving beyond a reasonable doubt that the defendant had the specific intent to kill the victim and that he killed him while engaged in either an armed robbery or simple robbery.

DISCUSSION

In the present case, the defendant argues that the conviction should be re *38 versed because the testimony of the state’s key witness, Elizabeth Byles, was insufficient to Uconvince a reasonable jury that he killed Mr. Carnline. Mrs. Byles’ testimony was a significant part of the State’s case.
The court must consider the record in its entirety to determine whether sufficient evidence was presented which would sustain the jury’s verdict under Jackson.
The defendant was arrested by a state trooper in the early morning hours following the commission of the homicide for the offense of driving while intoxicated. He was driving the victim’s truck at the time of the arrest.
Sam Mitchell testified that he was at the victim’s home with the defendant and the victim the night Mr. Carnline was killed. He testified he fell asleep in the victim’s house between 9:45 p.m. and 9:50 p.m. About an hour after he had gone to bed, he heard a noise that sounded like pots falling on the floor, but he did not investigate to determine the cause of the noise. He did not see the defendant shoot the victim and he did not hear the defendant leave the house in the victim’s truck.
At trial, the defendant’s father testified that the victim had given the defendant permission to drive his truck to Gonzales, Louisiana, for a few days to find a job. The defendant was supposed to leave for Gonzales in the victim’s truck on the day of the incident. This testimony was corroborated by the testimony of Donald Huff, who said that he was a friend of the victim and that he heard the victim give the defendant permission to use his truck to go find work on the day of the incident.
The state relied heavily on the testimony of Mrs. Byles in the presentation of its case.
1 BMrs. Byles testified that on the night of the incident, the defendant visited with her and her husband, Raymond Byles,[1] and admitted to having shot and killed a man.
A He didn’t right then, no. My husband said, man, who are with? [sic] He said, I’m by myself. He said, well now how did you get here? He said, I’m in a truck. And my husband said, well whose truck is it? He said he’s in the guy’s truck that I got into the fight with.
Q All right now? Eric said that he’she said I’m in the guy’s truck that I got into the fight with, is that correct?
A Yes, sir.
Q Then what was said next?
A Well, Chris said, all right, man, what is the deal? And he said, man, I think I killed somebody.
Q What did you or Chris say at that point?
A I didn’t know what to say. I didn’t — it’s not every day somebody just comes out and says they think they killed somebody, you know. But Chris said, man, what you think you just killed somebody? He said, well we got into a fight and I shot him. I think I killed him. He said, I know I killed him. I didn’t believe it.
Q You didn’t believe him?
*39 A No, I didn’t believe him. I believed he got into a fight — I mean, he said he got into a fight. I didn’t have no reason not to believe but as far as killing somebody, not Eric.
Q What was the next thing that was said or done?
A The next thing that was said or done, Chris said, man, whose truck you in? He said, I’m in the man’s truck I killed. He said — Chris said, who’s the man? He said, it’s a black dude.
IííQ He told you it was a black dude?
A Yes, sir.
This testimony was corroborated by the testimony of Officer Hembree, with the Sabine Parish Sheriffs Office, who testified that Mr. Byles had a telephone conversation with him regarding the defendant’s admission.
A He said his name was Raymond Byles and that he wanted to — he wanted me — first of all, he said that a male subject he identified only as his cousin came to his residence in a red pickup and said that he had gotten into a argument on the Sid Faust Road with a black male subject over some crack cocaine and that the black male subject had pulled a weapon on him — a pistol, that he had taken the pistol away from the black male subject and shot him twice in the head. Mr. Byles said that when the man came to his residence he appeared to be extremely distressed over the matter and had trouble getting information, you know, good information from him as far as the location.
[[Image here]]
Q Did he make any mention of somebody else sleeping in the house?
A He said that the man that came to his house, his cousin, told him that there was someone else sleeping in the residence when the altercation took place and that he knew who the shooter was.
Mrs. Byles further testified that the defendant took the murder weapon and other shotguns, which were allegedly owned by the victim, out of the truck and brought them inside her home to show her and her husband. She stated that the Defendant left her home after a half hour, leaving the weapons, including the murder weapon, on her porch. Despite her being on probation and not allowed to be in possession of any firearms, the weapons stayed at her home until she decided to hide them the next morning after she realized Mr. Carnline was killed. Two days later, she brought officers of the Natchitoches Parish Sheriffs Department to the site where she had hid the weapons and turned the weapons over to them.
|7The defendant points to what he considers to be deficiencies in the state’s case to support his insufficiency argument. No evidence independent of Mrs. Byles’ testimony places Oxley in the Byles’ home. The bullet that killed Mr. Carnline could not positively be identified as being fired from the gun Mrs. Byles identified as the murder weapon. No palm prints, fingerprints, or footprints were recovered from the scene. There were no witnesses to the crime. The facts of the crime did not fit with the facts Mrs. Byles’ claimed the defendant related to her as to how the crime occurred.
In addition to attacking the inconsistencies in Mrs. Byles’ testimony, the defendant raises issues regarding her bias and credibility. In particular, the defendant argues that the jury was unreasonable for relying on her testimony because she was a convicted felon and her husband at *40 tempted to make a deal with the sheriffs officers before he died.
On cross-examination, Mrs. Byles’ testified that she and her husband bought and sold weapons for a hying, which resulted in a revocation of their probation.
Q Were you and Chris in the business of buying guns from people?
A Yes, sir, we was gun collectors.
Q Did you buy and sell guns?
A Yes, sir, we bought and sold guns.
Q And who would you buy these guns from, just anybody that wanted to bring them by?
A If they weren’t stolen.
Mrs. Byles was also cross-examined on her husband’s attempt to make a deal with the Sabine Parish Sheriffs Office. She testified that her husband contacted the Sabine Parish Sheriffs Office at least five times within an hour after the defendant | ¡¿eft her home to inquire if they had found the body of a black man on Sid Faust Road. Eventually, he spoke to Officer Hembree, who testified that Mr. Byles refused to give the name of the person who he believed had done the killing unless someone from their office would talk to someone in the Natchitoches Parish Sheriffs Office to get he and his wife out of having to serve time in jail.
There were inconsistencies between Mrs. Byles’ testimony as to what she was told by the defendant and the facts established at trial. According to her testimony, the defendant admitted to having killed a black man after having a fight. She also stated that the defendant said he shot the black man in the head twice with a pistol. However, the victim was Caucasian and determined to have been killed by a single gunshot wound to the head.
When questioned whether she recognized the .22 caliber rifle that was introduced into evidence by the State, Mrs. Byles testified, as follows:
A He brought in a lever action with a scope and two others and a bow — a power pact compound bow.
Q He brought that all in your living room there?
A Yes, sir.
Q Let’s stop a minute. Does that look like one of the guns that he bought [sic] in? (Attorney showing exhibit)
A Yes, sir.
MR. DYESS: Object Judge. May we approach?
THE COURT: Yes, sir.
(Counsel approached the Bench for a conference with the Judge out of the hearing of the jury)
THE COURT: All right, was is [sic] the basis of your objection?
|c)MR. DYESS: The question was, Judge, does it look like one of the guns. She just said it was a lever action.
THE COURT: You can cross examine her on that.
(End of Bench conference)
THE COURT: All right, please proceed, Mr. Burkett.

MR. BURKETT-CONTINUING:

Q All right, this looks like one of the guns you’re saying?
A Yes, sir. There was one with a scope.
Q Okay, is the one you’re describing as lever action or what do you call it?
A I don’t know exactly what a lever action is.
Q What are you calling it — you said lever action, what are you talking about?
A Manual.
Q Manual kick — slides in and out of it?
A Right, uh huh.
*41 Mrs. Byles testified that the defendant gave her a lever action, two other shotguns and a compound bow. Thereafter, she agreed with the District Attorney that the Defendant gave her the murder weapon, two rifles and two shotguns, and the compound bow.
Mrs. Byles could not identify the other guns that the defendant allegedly brought to her home the night of the incident.
Q Do these look at all familiar? (Attorney showing exhibit)
A (Witness looking at exhibit)
Q If you can’t recognize them for sure, that’s okay. Just say yes or no.
|1ftA I can’t recognize for sure.
Finally, Mrs. Byles testimony regarding the time that the defendant visited her was inconclusive. Mrs. Byles estimated that the defendant left her home prior to 11:00 p.m. and that the visit lasted no longer than a half an hour before he left. She further testified that she called his grandmother approximately twenty to thirty minutes after he left and that she waited that length of time to allow him to make it home. However, the telephone records indicated that the time that she first called his grandmother was 11:38 p.m. If she contacted the defendant’s grandmother at 11:38 p.m., and the defendant stayed at her home no longer than a half an hour, the defendant would have left her home after 11:00 p.m., which contradicts Mrs. Byles’ testimony that the defendant left her home prior to 11:00 p.m.
It is obvious from the verdict rendered that despite inconsistencies in Mrs. Byles’ testimony, the jury believed all or certain aspects of her testimony that linked the defendant to the incident. From the verdict rendered, the jury apparently rejected the portion of the defendant’s admission that he killed a black man. Moreover, the jury rejected the testimony of the defendant’s father, Dean Oxley, and grandmother, Lovell Oxley, who both testified that the defendant was at home between 10:00 p.m. and 10:50 p.m. on the night of the incident. Their testimonies conflict with Mrs. Byles’ testimony that the defendant left her home prior to 11:00 p.m. the same night, after he had been talking with her and her husband for a half an hour.
In State v. Taylor, 96-1043 (La.App. 3 Cir. 2/5/97); 688 So.2d 1262, 1267, this court held:
A determination of the weight of evidence presented is a question of fact. The resolution of a matter where conflicting testimony exists requires a determination of credibility of the witnesses and is a matter of weight of the evidence and not sufficiency. Tibbs v. Florida, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State v. Nolan, 503 So.2d 1186 (La.App. 3 Cir.), writ denied, 507 So.2d 226 (La.1987).
Thus, the jury was allowed to accept or reject any part of her testimony and to determine what weight should be given the testimony in reaching the verdict.
From the testimony of Elizabeth Byles, together with the other facts established by both the state and the defendant, a reasonable fact finder could have concluded that the defendant killed Mr. Carnline. To reach this conclusion, the jury would have had to accept as true the defendant’s admission that he killed a man and that the truck which he was driving the night of the incident belonged to the man that he killed. There was sufficient evidence to show that on the night of the incident, the defendant was driving a truck that belonged to Mr. Carnline and that the defendant was with the victim shortly before his *42 death. Likewise, there was sufficient evidence to show that Mr. Carnline was killed as the result of a criminal act. See State v. Gaspard, 99-481 (La.App. 3 Cir. 11/3/99); 746 So.2d 725, citing State v. Martin, 93-285, p. 7 (La.10/17/94); 645 So.2d 190, 195. Therefore, it was reasonable to conclude that the man who the defendant killed was Mr. Carnline.
Moreover, the evidence was sufficient for a reasonable jury to conclude that the defendant and the victim were not involved in a fight prior to the time that the victim was killed. In the photographs taken of the crime scene, Mr. Carnline appeared to have been relaxed in his recliner at the time that he was shot, thereby undermining the defendant’s admission that the shooting resulted from an altercation. Additionally, Dr. Welke testified that the angle in which the bullet entered and exited the victim’s head would suggest that his head was leaned back on the cushion of the recliner, with his chin turned towards the right at the time that he was shot. Thus, the |12evidence was sufficient for the jury to conclude that the defendant had the specific intent to kill as required under La.R.S. 14:30.
In addition, the state presented sufficient evidence that the defendant had taken property belonging to the victim after he was killed. Again, his admission that the track in which he was driving belonged to “the man he killed” and the evidence that the truck belonged to the victim supports this conclusion. The jury was free to reject the defendant’s explanation of why he was in possession of the truck.
Moreover, the evidence was sufficient to show that the defendant took the victim’s weapons after he was killed. Mrs. Byles gave testimony that the two .22 caliber rifles, two shotguns and one compound bow introduced into evidence were the weapons the defendant said he had taken from the victim’s home. The weapons were identified as the victim’s property by Samuel Mitchell. Despite Mrs. Byles’ inability to conclusively identify the murder weapon and the other guns that she testified were in the defendant’s possession the night of the incident, the jury could have believed that the defendant took Mr. Carn-line’s weapons from his home the night of the incident.
Although the jury was free to reject the defendant’s explanation of why he was in possession of the truck, the jury did not have to reject the testimony of Mr. Dean Oxley and Mr. Huff that the defendant had permission to drive the truck to find that the defendant committed armed robbery. If the jury found that the defendant took the weapons from the victim’s home, that finding would have been sufficient to determine that an armed robbery took place and thus, support the conviction of first degree murder.
113Further, the evidence that the defendant took the victim’s truck and/or weapons after he killed him, was sufficient to convince a reasonable fact finder beyond a reasonable doubt that the defendant committed armed robbery under La.R.S. 14:64. See State v. Frost, 97-1771 (La.12/1/98); 727 So.2d 417.
Because the evidence is sufficient to find the defendant committed an armed robbery, it is not necessary to determine whether the evidence was sufficient to prove simple robbery, the alternative offense.
When viewing the evidence presented in a light most favorable to the state, as is required by Jackson, we find there was sufficient evidence to convince a reasonable trier of fact of the defendant’s guilt of the offense of first degree murder beyond a reasonable doubt. Because the evidence *43 is sufficient to uphold the jury’s verdict, this assignment of error is without merit.

ERROR PATENT REVIEW

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find one error patent.
The defendant was sentenced immediately after the trial court’s denials of his Motion for Post Verdict Judgment of Acquittal and Motion for New Trial. La. Code Crim.P. art. 873 requires the trial court to delay sentencing for at least twenty-four hours after the denial of a motion for new trial or a motion in arrest of judgment. There is no indication in the record that the defendant specifically waived his right to the twenty-four-hour delay prior to sentencing. However, the defendant received a mandatory life sentence and suffered no prejudice. Accordingly, this error is |T ¿harmless. State v. Williams, 617 So.2d 657 (La.App. 3 Cir.), writ denied, 623 So.2d 1331 (La.1993).
AFFIRMED.

. Raymond Byles was married to the witness Elizabeth Byles at the time that the Defendant made his admission at their home on the night that the victim was killed. At that time, they were both convicted of possession of narcotics and each was facing a revocation of their probation after being found in possession of firearms. Prior to the trial of this matter, both Mr. and Mrs. Byles were sentenced to prison for violating their probation. Before the trial of this matter, Mr. Byles died in prison.